# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Blanche Manning | Sitting Judge if Other than Assigned Judge | Geraldine Soat Brown |
|---|---|---|---|
| **CASE NUMBER** | 00 C 6587 | **DATE** | 4/4/2001 |
| **CASE TITLE** | G.E. Company vs. County of Cook | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Report and Recommendation to Hon. Blanche Manning recommending that plaintiff's motion for preliminary injunction [4-2] be GRANTED and that defendant's motion for disposition on partial findings [62-1] be DENIED is submitted herewith. Specific written objections to this report and recommendation may be served and filed within 10 business days from the date that this order is served. Fed. R. Civ. P. 72(a). Failure to file objections with the District Court within the specified time will result in a waiver of the right to appeal all findings, factual and legal, made by this Court in the report and recommendation. Lorentzen v. AndersonPest Control, 64 F.3d 327, 330 (7th Cir. 1995). *Geraldine Soat Brown*

(11) ■ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | |
| ✓ | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | APR 0 5 2001 | |
| | Docketing to mail notices. | date docketed | 104 |
| | Mail AO 450 form. | *mv* | |
| ✓ | Copy to judge/magistrate judge. | docketing deputy initials | |
| | | 4/4/2001 | |
| tw | courtroom deputy's initials | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

Document Number

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **GENERAL ELECTRIC COMPANY, a**<br>**New York Corporation**<br>**dba GE Medical Systems,**<br>**Plaintiff,** | )<br>)<br>)<br>)<br>) | **DOCKETED**<br><br>**MAR 0 5 2001** |
| v. | )<br>) | **Cause No. 00 C 6587** |
| **COUNTY OF COOK, a body politic and**<br>**corporate organized under the laws of the**<br>**State of Illinois, and**<br>**DD INDUSTRIES, LLC., a Delaware**<br>**limited liability company,**<br>**Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Judge Blanche M. Manning**<br>**Magistrate Judge Geraldine Soat Brown** |

To:   The Honorable Blanche M. Manning
      United States District Court Judge

## REPORT AND RECOMMENDATION

Geraldine Soat Brown, United States Magistrate Judge

The plaintiff's motion for preliminary injunction [Dkt #4] was referred to this Court for

report and recommendation. This Court heard 13 days of testimony from 19 witnesses, received

exhibits, and post-hearing submissions by all parties.[1]  Plaintiff's Motion to Amend its Verified

Complaint to conform to the Evidence under Fed. R. Civ. P. 15(b) [Dkt #83] was also referred to this

Court.   For the following reasons, this Court respectfully recommends that the plaintiff's motion

for preliminary injunction be GRANTED, and that defendants County of Cook and DD Industries,

LLC., be enjoined from proceeding with Contract No. 00-53-844 for Medical Equipment, Bid

---

[1]  The testimony of one additional witness, Jodell Basile, was submitted by deposition.

1

Package #3, pending resolution of this case on the merits. Also for the following reasons, the plaintiff's motion for leave to amend its Complaint is GRANTED.[2]

## JURISDICTION

The plaintiff General Electric Company d/b/a GE Medical Systems ("GEMS") alleges that the District Court has jurisdiction pursuant to 28 U.S.C. §1332. (Am. Compl. ¶6.) The parties have stipulated that GEMS is a New York corporation with its principal place of business in Connecticut; that DD Industries, LLC ("DD") is a Delaware limited liability company with two members, Siemens Medical Systems, Inc. ("Siemens"), a Delaware corporation with its principal place of business in New Jersey, and Faustech Industries, Inc. ("Faustech"), a Delaware corporation with its principal place of business in Illinois. (R.1215-16.)[3] The County is a body politic and corporate and a citizen of Illinois. (County Answer ¶3; DD Answer ¶3.) The District Court has determined that the matter in controversy exceeds $75,000. (Memorandum and Order, Dec. 28, 2000, dkt #37 at 21.)

## PROCEDURAL HISTORY

GEMS' Complaint and Motion for TRO.

On October 24, 2000, GEMS filed a Verified Complaint against Cook County seeking injunctive and declaratory relief. [Dkt #1.] GEMS asserted that the award on August 9, 2000 of a contract to DD for medical equipment pursuant to Bid Package #3 for the new Cook County Hospital (the "Contract") was contrary to state law, the County's own ordinances, and the terms and conditions of the bid request. GEMS sought a declaration of rights, including declarations that the

---

[2] A number of motions that were taken with the case are also decided herein.

[3] As used herein, "R.___" refers to the sequentially numbered pages of the transcript of proceedings on the preliminary injunction hearing from January 22, 2001 through February 9, 2001.

Contract is void, that GEMS was the lowest responsible bidder and that the Contract should have been awarded to GEMS; and injunctive relief consisting of a temporary restraining order and preliminary and permanent injunctions to prevent DD and Cook County from performing the Contract. At the same time, GEMS filed a motion for a temporary restraining order [Dkt #4] which was heard by District Court on October 26 and 27, 2000.

At the hearing before the District Court, GEMS' counsel expressed concern that, unless a TRO were entered, the hospital's radiology unit would start to be built around or at least designed around the equipment to be provided by DD instead of that provided by GEMS. (Tr. Oct. 26, 2000 at 3.) The County's counsel represented to the Court that there was no emergency, that the hospital was "a long way from completion" (*Id*. at 3), but that the physical construction of the radiology unit was scheduled to begin in five days. (*Id*. at 13.) The County also argued, *inter alia*, that GEMS was subject to a defense of laches. (*Id*. at 13-14.) On the second day of the hearing, the County called as a witness Randall Mark, the County's Director of Policy Analysis for Cook County Hospital. (Tr. Oct. 27, 2000 at 46-69.) Mr. Mark testified that within the next week the final design plans for one of the five sectors of the radiology department would be submitted by DD to the construction manager. (Tr. Oct 27, 2000 at 64-5.) He testified that "Over the last several months, Siemens has with its partner mounted an international effort to commandeer the resources from throughout their organization to aid our design group. . .in trying to finalize these design plans so that the contractor can build." (Tr. Oct 27, 2000 at 67.) At the conclusion of the hearing, the District Judge denied the motion for a TRO, but granted GEMS' request for expedited discovery, setting a discovery cutoff of November 17, 2000. (*Id*. at 71-72.)

3

The County filed a motion to dismiss the Complaint [Dkt #18], which was denied by the District Judge on December 28, 2000. [Dkt #37.] Following that ruling, DD moved for, and was granted, leave to intervene as a defendant on January 5, 2001. [Dkt #40.]

Discovery for the Hearing.

The District Judge referred the preliminary injunction hearing and discovery supervision to the Magistrate Judge. [Dkt #12.][4] Several events during discovery bear on the presentation of evidence at the preliminary injunction hearing. After the denial of the TRO, GEMS immediately served discovery requests on the County, including notices of depositions for various county officials and employees, among them the seventeen County Commissioners. (*See* Ex. B to County's Mo. to Stay Oral Discovery [Dkt #17].) The County filed a motion to stay oral discovery pending its motion to dismiss [Dkt #17], and a combined motion to quash the deposition notices and motion for a protective order, arguing that GEMS' effort to depose the County Commissioners was intended to harass and embarrass those officials. (Mem. in Supp. of the County's Combined Mo. at 5.) [Dkt #16.] This Court granted the combined motion as to elected officials, and entered and continued the motion as to non-elected officials. (Order, Nov. 16, 2000.) [Dkt #25.] This Court also struck the discovery cut off date and set the preliminary injunction hearing for December 18, 2000. [Dkt #25.] A schedule was set for the briefs on the preliminary injunction hearing, and the order provided, "Any Rule 26 disclosures of experts expected to testify at the preliminary injunction hearing shall be served by 12/8/00." (Order, Nov. 30, 2000.) [Dkt #30.]

---

[4] The referral was originally assigned to Magistrate Judge Denlow, but he recused himself and the referral was reassigned to this Court. [Dkt #13.]

4

Although not a party at this time, DD moved for a protective order to prevent GEMS from deposing its employees. [Dkt #23.] That motion was granted without prejudice to GEMS' right to move to compel depositions of persons necessary for the preliminary injunction hearing. (Order, Nov. 16, 2000.) [Dkt #25.] GEMS subsequently moved to compel depositions of various persons, including three County Commissioners, John Stroger, Joseph Moreno and Roberto Maldonado. [Dkt #33.] At the hearing on GEMS' motions on December 7, 2000, GEMS complained that it was not getting production of necessary discovery, and the County contended that it was producing documents as quickly as possible. It became apparent that the substantial work necessary for both parties to prepare properly for the preliminary injunction hearing could not be achieved prior to the hearing date of December 18, 2000. GEMS was reluctant to agree to a continuation of the hearing date, presumably because of concern that delay would prejudice its position. Thus, this Court suggested a "hiatus" for discovery and to resetting the hearing date to January 22, 2001. After consulting with their clients, counsel for the parties and for DD agreed to the hiatus, the terms of which were agreed to by counsel in court and set out in an order of December 7, 2000. [Dkt #35.][5] The order modified the previous briefing schedule and provided that Rule 26 disclosures of experts

---

[5] The order provided:

By agreement of the parties, the preliminary injunction hearing previously scheduled to begin on 12/18/00 is continued to 1/22/01 through 1/25/01. It is further agreed by the plaintiff, the defendant and by non-party witnesses Seimens Medical Systems, Inc, DD Industries, LLC, Daniel Desmond, Richard Brockman and J. Barry Cohen, Valerie O'Donnell, Progressive Industries, Inc. and Faustech Industries, Inc. Faust Villazan and Linda Flannery (the "Non-Party Witnesses) that the time between 12/6/00 and 1/22/01 will be considered a "hiatus" period. The plaintiff, defendant and Non-Party Witnesses agree that they will not claim that any time-related prejudice, including laches or waiver, occurred during or as a result of said hiatus period. However, no party or Non-Party Witness is precluded from claiming laches, waiver or prejudice from events before 12/6/00 or after the hiatus period is over.

Order, December 7, 2000. [Dkt #35.]

were due by 1/17/01. (*Id.*) That order also granted, over the County's objection, GEMS' motion to take the depositions of Commissioners Stroger, Maldonado and Moreno, limited to certain conditions and subjects. (*Id.*)

Motions in Limine.

The parties filed several motions in limine to bar evidence at the preliminary injunction hearing. GEMS filed a motion in limine to prevent the County and DD from presenting evidence of GEMS' bid on Bid Package #3, arguing that its bid was not relevant to the issue of a preliminary injunction. [Dkt #46.] GEMS' motion was denied without prejudice to GEMS' continuing to argue that its bid was not relevant. (Order, Jan. 12, 2001.) [Dkt #48.] Prior to the beginning of the hearing, DD and the County filed motions in limine to prevent GEMS from introducing evidence relating to political contributions made by Siemens and Faustech to the County Commissioners. [Dkt #56.] Those motions were denied. [Dkt #58.] (Tr. Jan 22, 2001 at 11, attached as Ex. A to County of Cook's Mo. to Strike Admission of Evidence.) [Dkt #71.]

Motions during the hearing.

At the close of GEMS' evidence, DD filed a Motion for Disposition on Partial Findings, pursuant to Fed. R. Civ. P. 52(c), arguing that GEMS had failed to present evidence that its bid was responsive to the County's bid specifications and that, therefore, GEMS could not demonstrate that it had standing or a likelihood of success on the merits. [Dkt #62.] Pursuant to F. R. Civ. P. 52(c), the Court deferred determination of that motion to be decided with the case. [Dkt #63.]

On the last day of the hearing, DD filed a Motion to Strike Testimony and Exhibits relating to certain evidence presented by GEMS. [Dkt #76.] That motion was entered and continued to be decided with the case. (Order, Feb. 9, 2001.) *See* discussion *infra*. The County renewed its Motion

to Strike Admission of All Evidence Relating to GEMS's Theory of Undue Influence [Dkt #71], which was denied. (Order, Feb. 9, 2001.) [Dkt #77.]

## FINDINGS OF FACT

Based on the evidence admitted at the preliminary injunction hearing, this Court finds as follows.

<u>The New Cook County Hospital Project</u>.

Cook County Hospital is a tertiary care facility, providing a full array of services for a half million patients per year. The Hospital has 1700 physicians on staff. (R. 2310.) Cook County Hospital provides unique and specialized care including a renowned neonatal intensive care unit for very ill babies, a nationally recognized Level I Trauma Center, an HIV-Tuberculosis treatment center, and an emergency room that treats 150,000 patients per year. (R. 2311-13.) The hospital was most recently fully accredited by the Joint Commission on Accreditation of Health Care Organizations in November, 2000. (R. 2310.)

In 1994, the Cook County Board of Commissioners voted to fund and build an entirely new hospital adjacent to the existing Cook County Hospital site, at Harrison and Wood Streets in Chicago. (Cty Ex. 45.) Dr. Bradley Langer, the Medical Director of Cook County Hospital, testified that the principal goal was to provide the same facilities and equipment to the medically indigent as is provided to patients of means at the most liberally endowed private hospitals. (R. 2334-36.) Walsh-Riteway Construction Company ("Walsh-Riteway") is the general contractor for the construction of the new hospital. The scope of Walsh-Riteway's contract with the County is to build the new hospital, less equipment, from the ground up, for a cost of $301,800,000. (R.1683-84.) The area of the new hospital that will contain state-of-the-art radiology equipment represents

7

approximately 75,000-80,000 square feet. The cost to build-out this area is approximately $12 million to $15 million. (R.1691.) In September, 1999, the County issued a "hold order" to Walsh-Riteway to suspend work on the build-out of the radiology area until such time as a specific vendor for the radiology equipment was selected and the area could be designed to incorporate the specific equipment requirements. (R.1690-92.)

Bid Package # 3 for Radiology Equipment and Picture Archiving and Communication System.

On April 10, 2000, the County issued an Advertisement for Bid for Bid Package #3 and on May 15, 2000, the County issued Bid Package No. 3, seeking bids for a complete turnkey package for Radiology Equipment and Picture Archiving and Communication System ("PACS")[6] for the new Cook County Hospital. (Pl. Ex. 2.) Dr. Patrick Dunne, the Chairman of the Radiology Department at Cook County Hospital, testified that the radiology facility at the new hospital is designed around a state-of-the-art, filmless medical imaging and archiving system that will eliminate the need for traditional x-ray film and film storage, and will allow for instant computerized imaging from multiple locations in the new hospital including key imaging capabilities in surgical and intensive care areas of the new hospital. (R. 1993-98.)

The County officials were aware that, because of nature and sophistication of the equipment specified in Bid Package #3, only a small number of manufacturers could realistically participate in the bidding because only a limited number of manufacturers made the various types of equipment required in the County's specifications for the level of care sought. The County knew that GEMS, Toshiba America Medical Systems, and Siemens were the likely bidders. (R. 1874-80.) The various special conditions for Bid Package #3 were drafted by a committee composed of representatives

---

[6] PACS is a means of digitally storing and transmitting radiology information.

8

from the County's Department of Capital Planning, EQ International ("EQ") a consultant for the County, and other consultants. The committee, with input from the doctors at Cook County Hospital, worked to insure that only those manufacturers with the requisite experience could bid responsively. (R. 1879-81.)

Bid Package #3 contained an advertisement for bid, instructions to bidders, general conditions, special conditions, miscellaneous forms, and proposal forms. (Pl. Ex. 2.) The Instructions to Bidders in Volume 1 of Bid Package #3 defined "Bidder" as "any individual, firm, partnership or corporation submitting an approved proposal for Work contemplated by these Contract Documents" (Pl. Ex. 2 at IB-1) and defined "Contractor" as "the individual, firm, partnership or corporation submitting a bid and to whom the Cook County Board of Commissioners awards the contract . . ." (*Id.*) The Instructions to Bidders further provided:

> This contract is a competitively bid public contract of Cook County government subject to laws and ordinances governing public contracts. The bidder shall at all times observe and comply with all laws, ordinances, regulations and codes of the Federal, State, County and other local government agencies which may in any manner effect the preparation of the Bid Proposal or the performance of the contract.

(Pl. Ex. 2 at IB-02).

### 1. General Condition 32: M/WBE requirements.

General Condition 32 to the bid package contained minority business enterprise ("MBE") and women's business enterprise ("WBE") requirements (collectively "M/WBE"). (Pl. Ex. 2 at GC-32.) General Condition 32 required that bidders set aside not less than 30% and 10%, respectively, of the total contract price for the participation of MBEs and WBEs. (*Id.*) Although described as "goals," these percentage levels are mandatory unless a written request for waiver is made by the bidder and granted by the County. (R. 81-82) The County's M/WBE ordinance provides that no

bidder shall be awarded an eligible contract unless the Office of Contract Compliance has approved its M/WBE plan or granted a waiver. Cook County Code §10-43.6(B)(2). The specifications for Bid Package #3 provide that any bid that fails to meet that commitment "shall be rejected." (Pl. Ex. 2 at GC-32.) The County's Office of Contract Compliance has the responsibility of reviewing bids for compliance with the M/WBE Ordinance. (R. 80.) Upon review of a bid, if the Office of Contract Compliance determines that the M/WBE requirements are not met and no waiver was requested, the Office makes a determination that the bid is not responsive to the Ordinance. (R. 81-82.) Upon completion of its review, the Office of Contract Compliance forwards a letter to the purchasing department with its finding regarding the responsiveness of the bids submitted. (R. 80-81.)

The M/WBE Ordinance allows its requirements to be met through either "direct" or "indirect" participation of M/WBEs. Direct participation is the direct purchase from M/WBEs of goods or services used in the performance of the contract. (R. 2208; Pl. Ex. 2 at GC-32.III.H.) While the ordinance permits the M/WBE requirements to be met through indirect participation, credit for indirect participation is allowed only upon a showing that direct participation could not be obtained. (Id.; R. 2293-94, 2296.) It is not sufficient, for purposes of that showing, to establish that direct participation will add to the cost of the bid. (R. 2296.)

M/WBEs directly participating in the project were required to perform a "commercially useful function," defined as the "performance of real and actual services in the discharge of any contractual endeavor." (Pl. Ex. 2 at GC-32.II.B; R. 46-47.) The County's Office of Contract Compliance has interpreted the Ordinance to find that no commercially useful function is served by an M/WBE that purchases equipment from the bidder and then sells that same equipment to the County, a process commonly referred to as a "pass-through." (County of Cook's Affirmative Defenses and Counterclaims ¶ 48.) The situation where an M/WBE purchases equipment

10

manufactured by the bidder through a licensed distributor (separate from the bidder) and then sells

that equipment to the County, however, is not considered by the Office of Contract Compliance to

be an impermissible pass-through. (R. 2283.)

In the event M/WBE participation was to be in the form of a joint venture, General Condition

32 provides that the participation of the M/WBE could be counted only if:

(a) The M/WBE joint venturer(s) share in the (a) ownership, (b) investment, (c) control, (d) management responsibilities, (e) risks, and (f) profit of the joint venture in proportion with the M/WBE ownership percentage;

(b) The M/WBE joint venture(s) is responsible for a clearly defined portion of work, commensurate with its percentage joint venture ownership, to be performed with its own workforce and/or equipment; and

(c) The work assigned to the M/WBE joint venturer must be clearly designated in the Joint Venture Agreement and must be work which the M/WBE joint venturer has the skill and expertise to perform. The Contract Compliance Administrator may deny or limit M/WBE credit to a contract where the M/WBE joint venturer is found not to be performing a commercially useful function or not to have duties and responsibilities, management control or risk with respect to the joint venture commensurate with or in proportion to its joint venture ownership.

(Pl. Ex. 2 at GC-32.III.B.) In addition, where M/WBE participation was to be achieved through a

joint venture, the contractor was required to submit a Schedule B Joint Venture (M/WBE) Affidavit.

(Pl. Ex. 2, at GC-32.IV.A.) The Affidavit was to be accompanied by a copy of the joint venture

agreement,

> clearly evidenc[ing] that the MBE or WBE joint venturer will be responsible for a clearly defined portion of the work to be performed with its own forces and/or equipment and that the MBE or WBE firm's responsibilities are in proportion to its ownership percentage. To demonstrate the MBE or WBE joint venturer's share in the ownership, control, management responsibilities, risks and profits of the joint venture, the proposed joint venture agreement shall include specific details related to (1) the contributions of capital and equipment, (2) work items to be performed by the MBE's or WBE's own forces, (3) work items to be performed under the supervision of the MBE or WBE joint venturer; and (4) the commitment of

management, supervisory and operative personnel employed by the MBE or WBE to be dedicated to the performance of the project.

(*Id.*, emphasis added.)

Because Bid Package #3 was to be a "turnkey operation," the successful bidder would be required to retain both Walsh-Riteway and the County's Architect as its subcontractor, so that the County would have only one contractor to look to for the full responsibility of the build-out of the radiology unit. Special Condition 17 required that each bid include a $242,000 design allowance and $6,625,000 construction allowance reflecting the estimated amounts for the County's Architect and Walsh-Riteway's work. (Pl. Ex. 2 at SC-17.) These amounts were to be included in the bidder's total price for purposes of establishing M/WBE participation, even though the bidder would have no option to use any other contractors but the County's Architect and Walsh-Riteway for this portion of the work. (R. 627; Pl. Ex. 4 at Addendum No. 2, p. 12.)

### 2. Special Conditions 21 and 24: Bidder and Contractor requirements.

Special Condition 21 to the bid package required that "[t]he Primary bidder must demonstrate that they have been in business for 10 years or more." (Pl. Ex. 2 at SC-21.) It further provided:

- The Contractor shall provide a list of similar size installations of PACS systems and radiology equipment installations completed in the last three years in the United States;

- The Contractor must have extensive project planning and installation services expertise in projects of similar size and scope;

- The Contractor shall provide a description of local and factory based service capability, including the number of service technicians, their base locations.

Special Condition 24 required "that at least 60% of the new equipment systems included in [a] bid are from the same OEM [original equipment manufacturer] or two strategically aligned co-partnered OEMs." (Pl. Ex. 2 at SC-24.)

12

<u>The award of the Contract.</u>

As foreseen, only three manufacturers of radiology equipment submitted bid proposals for Bid Package #3: DD, GEMS and Toshiba. Toshiba did not file a performance and payment bond. (County Answer at ¶14; DD Answer at ¶14.) The bids were opened on June 22, 2000 and reported by the County's Office of Purchasing Agent to the Board on July 11, 2000. (Pl. Ex. 46.) The report stated that "Siemens/Faustech Joint Venture" submitted a base bid of $49,337,491; that GEMS submitted a base bid of $52,016,488, and Toshiba submitted a base bid of $59,883,805. (*Id.*) It indicated "Siemens/Faustech Joint Venture" as the lowest qualified bidder meeting specifications. (*Id.*) The proposal that was submitted by "Siemens/Faustech, a Joint Venture, a DD Industries, LLC, Company" was accepted by the County on July 11, 2000. (Pl. Ex. 4 at PE-12.) The Contract was approved by the County Board on August 9, 2000. (Pl. Ex. 49 at 8.)

<u>Formation and nature of DD</u>

In early May 2000, Siemens and Faustech began discussions about Faustech's playing a role along with Siemens in submitting a response to Bid Package #3. (R. 234-35, 1028-29.) J. Barry Cohen was Siemens' account executive responsible for the Cook County account. (R. 987-88.) Mr. Cohen had begun consideration of ways to satisfy the County's M/WBE requirements for a radiology bid by February 2000, as reflected in an e-mail from Mr. Cohen to Richard Brockman, the district manager for Siemens. (Pl. Ex. 30; R.1848.) In that e-mail, Mr. Cohen noted the difficulty of complying with the M/WBE requirements in a contract that included no significant construction. (Pl. Ex. 30.) Forming a joint venture with an M/WBE was not among the possibilities considered by Mr. Cohen in February 2000. (R. 1848-49.) Mr. Cohen met with representatives of two different MBEs in early May 2000 to discuss the possibility of working together to bid on Bid Package #3.

13

On May 4, 2000, Mr. Cohen met with Faust Villazan, President of Faustech. (R. 1849.) On May 5, 2000, Mr. Cohen met with Ken Jurczyk of Ravenswood Medical Resources Corp. (R. 1025, 1487-88.) Mr. Villazan followed up on his meeting with Mr. Cohen by sending a letter dated May 8, 2000 proposing that Faustech act as a subcontractor for Siemens in connection with Bid Package #3. (Pl. Ex. 167.) This May 8, 2000 letter does not discuss a joint venture. (R. 1851-52; Pl. Ex. 167.)

Mr. Villazan arranged a dinner for representatives of Siemens and Faustech to meet with Mitchel Rabin, an official with the County's Office of Contract Compliance who would be responsible for reviewing the bids submitted in response to Bid Package #3. (R. 86-87, 233-34.) On May 9, 2000, Messrs. Villazan and Cohen, and Michael Alesia, an attorney representing Faustech, participated in a dinner meeting with Mr. Rabin. (R. 234, 1852.) The subject of a joint venture between Siemens and Faustech was raised at that meeting. (R. 234-35, 1033.)

Mr. Villazan arranged a lunch on May 11, 2000, at which Messrs. Cohen and Brockman, along with Gordon Rice, Vice President of Sales for Siemens in the United States, and Tim O'Shea, Regional Vice President of Sales for Siemens, met with Cook County Board Commissioner Roberto Maldonado, the chair of the Board's Cermak and Cook County Hospital Committee. (R. 235-37, 1852.)[7]

Following these two meetings, a possible joint venture was documented for the first time in a May 22, 2000 letter from Mr. Alesia (Faustech's counsel) to Ellen Roth (counsel for Siemens). (Pl. Ex. 39; R. 238-39; 1852-53.) Mr. Alesia's letter stated that "we have information that the Board of Commissioners of Cook County views [a joint venture] as the preferred method of securing

---

[7] Mr. Villazan testified that he frequently takes Commissioner Maldonado to dinner, for which Mr. Villazan always pays. (R. 237.)

minority participation in its contracts." (*Id.*) Also, shortly following these meetings, Siemens decided to use Faustech as its MBE in connection with Bid Package #3, rather than Ravenswood or any other MBE. (Pl. Ex. 40.)

On or about June 1, 2000, Siemens and Faustech formed DD Industries, LLC, a Delaware limited liability company. (Pl. Ex. 21.) On or about June 21, 2000, Siemens and Faustech entered into a Joint Venture Operating Agreement ("JV Agreement") dated as of June 1, 2000.[8] (Pl. Ex. 21.)

The JV Agreement provides that Siemens and Faustech are the members of the limited liability company, with Siemens having a 70% allocation and Faustech having a 30% allocation. (Pl. Ex. 21, Schedule A.) DD has a term limited to five years. (*Id.* §2.2.) DD was capitalized on June 21, 2000 by a $30,000 contribution from Faustech and a $70,000 contribution from Siemens. (*Id.* at Schedule A; R. 102.) That initial capitalization of $100,000 constitutes the entire assets of DD. (R. 102.) Under the JV Agreement, that initial capital contribution is the maximum aggregate amount of cash and property that either member is required to contribute to the capital of the company. (Pl. Ex. 21, §3.1.) No member is required to guarantee any company indebtedness. (*Id.* §3.2.) Neither member has any personal liability for the debts and obligations of the Company. (*Id.* §3.3.) The JV Agreement refers to "certain Service Agreements" which DD is to enter into with Siemens and with Faustech (*Id.* §1), however, no such service agreements were ever prepared. (R.103.) Under the JV Agreement, Siemens maintains the books and records of DD. (Pl. Ex. 21 §6.4.) The Board of Directors, consisting of two Siemens representatives and one Faustech representative, may delegate the authority to manage DD in its sole discretion. (*Id.* §5.1.)

---

[8] On June 20, 2000, at 6:00 p.m., Siemens' counsel, Ms. Roth transmitted a draft of the JV Agreement to Faustech's counsel, Mr. Alesia. (Pl. Ex. 168.) Thus, although the JV Agreement is dated June 1, 2000, it is clear that it was not signed until June 21, 2000.

GEMS contends that a "side agreement" between Siemens and Faustech was negotiated by Mr. Villazan and Mr. Brockman that limited Faustech's fee and risks so that Faustech does not share in the profits and losses of DD. DD disputes that any side agreement was entered into that is at variance with the JV Agreement. The Court finds that the evidence supports GEMS' position that such a side agreement was made. On May 25, 2000, Mr. Alesia sent an e-mail to Siemens counsel Ellen Roth stating:

> I understand that Faust [Villazan] and Richard [Brockman] struck a deal for a total sum of $450,000 with an additional bonus of $50,000 if the purchase order from the county is issued by 8/31/00. There are other payment terms which I do not have with me at the moment. I will forward it to you tomorrow (Friday).

The following day, May 26, 2000, Mr. Alesia sent a letter to Ms. Roth by facsimile and e-mail setting out certain modifications of the draft JV Agreement (which were incorporated in the final document, Pl. Ex. 21) and certain additional terms, which Mr. Alesia states "shall be made by Addendum for reasons we discussed." (Pl. Ex. 41 & 42.) The additional terms included a "guaranteed lump sum" payment to Faustech of a base amount of $450,000, with increases under certain conditions, for example, an additional payment of $50,000 if the County issued its purchase order before August 31, 2000. (*Id.*) Faustech was to be paid $100,000 within 10 days after the County issued a purchase order to DD, or $150,000 if the purchase order was issued on or before August 31, 2000. If the County were to order any additional equipment from DD, Faustech's share of the additional charges to the County for the purchase of such additional equipment would be only 1%. (Pl. Ex. 41 & 42.) Mr. Alesia's letter states that Siemens and Faustech also agreed that Siemens would be solely liable and would indemnify, defend, and hold Faustech harmless from any claims resulting from a contract with the County. (Pl. Exs. 41 and 42.)

16

Although the side agreement was never acknowledged in writing by Siemens as Mr. Alesia requested, the evidence at the hearing supported the existence of the side agreement. Although Mr. Villazan testified that the provisions in the letter were only guidelines, and were not everything that was agreed to (R. 258-59), he testified that the agreement between Siemens and Faustech required: (a) that Faustech was to be paid $500,000, which included a $50,000 bonus for the issuance of the purchase order before August 31, 2000; (b) that Faustech would not share in any profits of DD beyond the $500,000; and (c) that Faustech would never have to return any of the $500,000 regardless of DD's profit or loss on the contract. (R. 258-59, 320.) He was only uncertain whether there was agreement that Siemens would hold Faustech harmless. (R. 259.) Furthermore, Mr. Villazan admitted during his deposition that the provisions in Mr. Alesia's letter (Pl. Exs. 41 and 42) were consistent with the oral agreement between Siemens and Faustech. (R. 260-65.) Mr. Villazan also testified that Faustech would not share in any losses beyond its initial $30,000 capital contribution to DD. (R. 271-72.) Mr. Villazan characterized the $500,000 as Faustech's share of the expected profits. (R. 266-67.)

Daniel Desmond, the President of DD and a business administrator of Siemens (R. 99) was aware of the $500,000 fee to Faustech and testified that the amount of $500,000 was "negotiated" between Siemens and Faustech as Faustech's "recognized profit at this point in the project." (R. 144.) He characterized the amount as an advance on profits. (R. 159.) However, he was not the person who reached the agreement with Mr. Villazan, and did not even know who had reached the deal with Faustech. (R.147-48.) Furthermore, internal Siemens documents, including Mr. Desmond's, support the existence of the side agreement.

Between August 11 and August 26, 2000, a series of e-mails were sent among various Siemens employees. (Pl. Ex. 36.) On August 11, 2000, Mr. Desmond e-mailed his superior that Mr.

Villazan was requesting that Faustech be paid "60% upon purchase order receipt, 20% upon delivery of the orders and 20% upon acceptance" instead of "what we have originally agreed to." Mr. Desmond stated that "He [Villazan] contributed significantly to get this order." (*Id.*) When Mr. Desmond's superior balked, Mr. Brockman wrote "Faust [Villazan] has some obligations to handle and would like to get $300k *instead of the $150k* he agreed to at the beginning." (*Id.*, emphasis added.) The superior then agreed, and the Siemens accounting department was directed to have a check sent overnight to Mr. Villazan. (*Id.*) Siemens' accounts payable voucher reflects a payment of $300,000 to Faustech on August 22, 2000–thirteen days after the County Board approved the Contract–as "MBE fees" in response to an invoice from Faustech *to Siemens* for "consulting fee." (Pl. Ex. 37.)

Mr. Brockman's reference to "the $150k" is consistent with the payment terms of the side agreement. (Pl. Exs. 41 and 42.) Mr. Desmond's August 11 e-mail confirms that there was an established amount expected to be paid to Faustech upon which percentages could be calculated long before DD's profit could actually be determined. Furthermore, the source of the payment was Siemens, not DD, as would have been the case if it were an advance under the JV Agreement. DD could not have made an advance of $150,000, let alone $300,000, since its total assets were $100,000. That the sharing of profit 70/30 between Siemens and Faustech was fiction is additionally reinforced by a series of internal e-mails among various Siemens divisions describing disputes as to responsibility for various parts of the Contract. (Pl. Ex. 260.) In light of the squabbles between divisions that describe themselves as "pressed for [profit] margin" (*Id.* at Bates no. SMS 2987), it is impossible to believe that Siemens would agree to give 30% of the profit to Faustech, which had no responsibility for the design or providing of radiology equipment.

Significantly, DD did not proffer any testimony from key persons involved in establishing the parameters of the Siemens-Faustech relationship to rebut the evidence adduced by GEMS that DD was not a valid joint venture. Mr. Cohen, Siemens' account executive for the Contract, testified on behalf of DD, but he denied that he had any involvement in working out the arrangements with Faustech. (R. 1029-30.) He described Mr. Brockman, Ms. Roth, Mr. Villazan and Mr. Alesia as the people who made the decision. (R. 1033.) As noted above, Mr. Villazan's testimony supports the side agreement. None of the other persons were called by the defendants to testify.

The evidence thus establishes the existence of a side agreement modifying the JV Agreement, pursuant to which Faustech does not share in profits or losses of DD. Rather, Faustech is to receive a fixed fee, two-thirds of which it received less than two weeks after the award of the Contract. That fee is not subject to modification depending on DD's profits or losses. Faustech has no potential liability or, at most, its exposure is limited to its $30,000 capital payment.

DD's Bid submission regarding its M/WBE participation.

The County's ordinance and General Condition 32 provide that a contractor may achieve the M/WBE goals by a number of methods, including a joint venture with one or more M/WBEs. County Code §10-43 (B)(3). There is no express provision relating to membership in a limited liability company. The ordinance further provides that the County may deny or limit M/WBE participation credit where the minority joint venture partner "is found not to be performing a commercially useful function or not to have duties, responsibilities, management control or risk with respect to the joint venture commensurate with or in proportion to the joint venture ownership." County Code §10-43 (B)(3)(a). The ordinance defines "owned" as " having all the customary

incidents of ownership, including the right of disposition, and *the sharing in all risks and profits commensurate with the degree of ownership interest*." County Code §10-43.2(J), emphasis added.

DD's bid on Bid Package #3 identified Faustech as Siemens' MBE and joint venture partner at a 30% participation level, and Progressive Industries, Inc. ("Progressive") who was to be DD's subcontractor at a 10% participation level, as DD's WBE. (Pl. Ex. 4.) DD made no written request for waiver of the M/WBE participation requirements, and no waiver was granted by the County. (R. 86.) A 30% participation in DD's initial bid of $49,298,011 amounts to $14,789,403. A 10% participation amounts to $4,929,801.[9]

General Condition 32 of the Contract required a bidder whose "Utilization Plan includes the participation of any MBE or WBE as a joint venturer" to submit a seven-page "Schedule B: Affidavit of Joint Venture" informing the County about the structure and management of the joint venture. (Pl. Ex. 2.) The Affidavit provided that "[a]ny material misrepresentation will be grounds for terminating any contract which may be awarded...." (*Id.*) The Affidavit required specification of "other agreements that restrict or limit ownership and/or control," to which DD answered "-0-." (Pl. Ex. 4 at 37.) The Affidavit required that the bidder specify the percentage of profit and loss sharing in the joint venture. (Pl. Ex. 2.) In its Affidavit, DD averred that its profit and loss sharing was "in accordance with ownership percentage" *i.e.*, 70% to Siemens and 30% to Faustech. (Pl. Ex. 4 at 36.) DD described Faustech's services as "purchasing Medical Supplies and Equipment, Computer Supplies and Equipment, and provide Delivery Services and Installation, will also act as a liaison between (WBE) subcontractors, will procure all licenses and permits for the project and provide on-site management experience." (Pl. Ex. 4 at 23.)

---

[9] DD's initial bid of $49,298,011 was subsequently corrected by the County for an arithmetical error to $49,337,491. (Pl. Ex. 46.)

The side agreement between Siemens and Faustech was never disclosed to the County. (Pl. Exs. 41, 42, 168; R. 216, 275.) Mr. Villazan testified that he believed that information regarding Faustech's profit and loss structure was not any of the County's business. (R. 268-69.)

After the bids were opened, Elizabeth Scully, a supervisor in the Cook County Office of Contract Compliance, reviewed DD's bid for compliance with the M/WBE requirements. (R. 43-47.) Ms. Scully identified a number of issues regarding DD's compliance with the M/WBE requirements. She sent a June 28, 2000 memorandum to Betty Hancock Perry, head of the Office of Contract Compliance. (Pl. Ex. 20; R. 47-48.) Ms. Scully's memorandum of June 28 noted that Faustech was "listed as 'purchasing medical supplies and equipment, . . . computer supplies and equipment, and provision of delivery services and installation . . . liaison between WBE subcontractors. . . .'" (Pl. Ex. 20.) However, Faustech was not certified as an MBE for either liaison work or installation. (Pl Exs. 9, 20; R. 49-53.) She also noted that there were discrepancies between the Affidavit and the documentation provided, and the fact that Siemens was to handle the financial transactions, limiting control by the MBE. Significantly, she asked, "What exactly is the MBE participation in the JV valued at $14+ million, particularly when majority of equipment is manufactured by Siemens, JV partner?" (*Id.*) She also questioned how Progressive, the WBE, could have a participation level of 10% when DD's bid cover letter to the County stated, "Over 95% of all the equipment proposed herein is manufactured by a single supplier, Siemens Medical Systems." (Pl. Ex. 4 at 2; R. 55.)

Ms. Scully specifically asked DD for information justifying Faustech's MBE participation. Ms. Scully called Mr. Villazan and asked for further information about Faustech's role in the contract. (R. 58, 276-77.) Ms. Scully's inquiry caught Mr. Villazan by surprise because the County had never before asked for such detail. (R. 280.) At the time of this call, neither Siemens nor

Faustech had attempted to break out any work to be performed by Faustech that would constitute its $14.8 million participation in the contract. (R. 192.) Prior to this time, Mr. Villazan had never even heard the term "commercially useful function." (R. 282-83.)

On July 6, 2000, Mr. Villazan wrote to Ms. Scully in response to her inquiries. (Pl. Ex. 44a.) With regard to "a breakdown of the work to be performed by Faustech," he identified "a list of equipment that will be Faustech's responsibility to obtain." (*Id.*) The list identified the following:

| Item Description | Extended Cost |
|---|---|
| R/F System, Digital | $1,733,015.00 |
| Ultrasound, Real Time | 2,066,877.00 |
| Ultrasound, Real Time, Malmo | 389,261.00 |
| MR, Open, Upgrade Package | 1,240,520.00 |
| Cardiac Cath System, Bi-Plane | 1,369,730.00 |
| PACS System | 7,990,000.00 |
| TOTAL: | $14,789,403.00 |

(Pl. Ex. 44a.) All of the equipment listed in Mr. Villazan's July 6 letter was manufactured by Siemens (R. 279), and included within the extended cost was the costs of delivery, project management, and installation that Faustech would purportedly perform. (Pl. Ex. 44a.)

Ms. Scully discussed the July 6, 2000 letter with her superior, Betty Hancock Perry. (R. 59.) They determined that they needed additional information to ascertain what services Faustech was going to perform. (*Id.*) Ms. Scully asked Mr. Villazan for a breakdown of the extended price for the equipment listed in the July 6 letter. (*Id.*) On July 7, 2000, Mr. Villazan responded by facsimile. (Pl. Ex. 44b.) The extended cost breakdown showed that the equipment cost comprised $13,902,038 of the total of $14,789,403 value being provided by Faustech. (*Id.*; R. 61, 278.) On July 10, 2000, the Office of Contract Compliance advised the County's purchasing agent that it found DD's bid to be in compliance with the M/WBE General Condition 32 and the ordinance. (Pl. Ex. 46.)

Mr. Villazan's statements in response to Ms. Scully's inquiry are contrary to the testimony of Mr. Desmond. Mr. Desmond testified that Faustech will not be purchasing any of the equipment identified in Mr. Villazan's letters to the County. (R. 193-97.) At most, Faustech will purchase certain components of the equipment. (*Id.*) Second, Mr. Desmond admitted that Faustech would not perform either delivery or installation of the equipment. (R. 193.) Mr. Desmond testified that Faustech "maybe coordinating the delivery [of equipment]." (R.196.) This is consistent with the testimony of Steve Duran, DD's project manager, that Faustech is supplying some third-party equipment and at the end of the work will be supplying laborers and installers to bring the Siemens equipment from the loading dock, uncrating it, anchoring it and assembling some unspecified portions. (R.858-59.) Mr. Duran also testified that Mr. Villazan attends a meeting every two months with senior people involved with Cook County Hospital (R. 860-61), and attends project administration meetings as a representative of DD when directed by Mr. Duran. (R. 861-62.) Mr. Villazan also coordinated the assembly of the DD's bid to see that it complied with the required format. (R.1045.)

The evidence does not show a "commercially useful function" to be performed by Faustech commensurate with its purported 30% participation valued at $14.8 million. Mr. Villazan was unable to identify any commercially useful function being performed by Faustech with regard to the Siemens equipment. (R. 280-89.) The provision by Faustech of Siemens equipment obtained from Siemens is pass through. (R. 499, 1447-8, 1626, 2285-86; County's Affirmative Defenses and Counterclaims at ¶ 48.) A pass-through role does not constitute a commercially useful function within the meaning of General Condition 32. (*Id.*) Faustech is not certified as an installer and none of the three employees of Faustech are qualified to install the complex electronic medical equipment being supplied. (Pl. Ex. 9; R. 52, 285-90.)

The August, 2000 internal Siemens e-mails discussed above justify increasing the early payment to Faustech on the grounds that Mr. Villazan "contributed significantly to get this order" and "Faust [Villazan] has some obligations to handle." (Pl. Ex. 36.) Prior to the award of the bid, Mr. Villazan arranged a number of meetings between County representatives and representatives of Siemens and Faustech, in addition to the May 9, 2000 dinner with Mr. Rabin and the May 11, 2000 lunch with Commissioner Maldonado.[10] For May 23, 2000, Mr. Villazan arranged both a meeting with Michael LaMont, Director of the Office of Capital Planning and Policy, which was the County office responsible for administering Bid Package #3, and a second dinner with Mr. Rabin attended by Messrs. Cohen, Brockman, Villazan, and Alesia and Ms. Roth. (Pl. Ex. 191, R. 242, 1030, 1032, 1042.) On June 16, 2000, five days before the bids were due, Faustech contributed $1,500 to Commissioner Maldonado. (Pl. Ex. 183; R. 243-44.) Siemens likewise contributed $1,500 to Commissioner Maldonado on June 16, 2000. (Pl. Ex. 189; R. 207-208.) Mr. Villazan had earlier impressed upon Siemens the need to deliver a contribution to Commissioner Maldonado by June 16, 2000. (Pl. Ex. 189; R. 245). Siemens' contribution was charged to its Chicago sales cost center. (R. 209.) Both Mr. Villazan and Mr. Cohen attended Commissioner Maldonado's fundraiser on June 22, 2000, the day the bids were opened. (R. 243-4.) On June 29, 2000, before the award of the Contract had been made, Faustech contributed $1,500 to and attended a fundraiser for Commissioner Moreno. (R. 245-46.) On July 26, 2000, Siemens/Faustech made a $25,000 contribution to the County Care Foundation, which is a foundation created for the benefit of the new Cook County Hospital. (R. 246-47.) By this contribution, Siemens/Faustech became a major sponsor of a gala

---

[10] Mr. Villazan testified that he had participated with GE in various County projects and that he had invited Commissioner Maldonado to lunch with GE representatives in the past. (R. 314.) He did not testify as to whether or when these lunches occurred. (*Id.*)

that was held at the United Center on August 5, 2000, which was attended by Mr. Villazan and representatives of Siemens. (*Id.*) Commissioner Maldonado was a guest at the Siemens/Faustech table. (*Id.*) The $25,000 check was actually issued by Siemens. (*Id.*) The evidence, including the timing and amount, of the payment to Faustech by Siemens, combined with the paucity of evidence regarding any significant commercially useful function to be performed by Faustech, leads to a conclusion that the primary role of Faustech in the bid process and the purported joint venture was to arrange access to County officials for Siemens representatives.

Prior to the hearing, the County and DD moved in limine to exclude evidence of Siemens' and Faustech's political contributions. [Dkt #56 and #57.] GEMS' counsel admitted that none of the Commissioners testified that they were unduly influenced in awarding the Contract because of the political contributions or dinners. (Tr. of hearing on Emergency Motions, Jan. 22, 2001 at 3.) The motion to exclude the evidence was denied as premature because it was not clear that the evidence would be irrelevant (*Id.* at 8), and because the motion was not supported by F.R.Evid.403. (*Id.* at 11.) On January 26, 2001, DD renewed its motion to exclude testimony about political and charitable contributions, in which the County joined. (R. 961.) This Court denied the renewed motion, ruling that the evidence of political contributions was relevant to at least one issue, i.e., the relationship of Faustech and Siemens and whether Faustech performed a commercially useful function, and therefore the evidence would not be stricken, notwithstanding the defendants' assertions that they would have to call the Commissioners as witnesses if the motion were denied. (R. 2144-49; 1519-22.) The defendants did not, in fact, call any of the Commissioners to testify. Instead, the County, on the last day of the hearing, attempted to recall Elizabeth Melas, a witness the County had previously called and completed. This Court ruled that Ms. Melas could respond to the issue of political contributions, but that she could not testify about Faustech's "commercially useful

function" on the Contract, an issue as to which the County had had a full opportunity to present testimony. (R. 2303-05.) The County made an offer of proof concerning Ms. Melas' testimony. (R. 2306-07.) That offer of proof related primarily to Faustech's work on other contracts. With respect to Bid Package #3, Ms. Melas' testimony would have been that she has seen Mr. Villazan at meetings one or two times a week. (R. 2307.) That testimony, even if admitted, would not have changed the conclusion.

As noted above, in order to comply with General Condition 32, and to count toward the bidder's M/WBE participation, the minority members of an M/WBE joint venture must share in the (a) ownership, (b) investment, (c) control, (d) management responsibilities, (e) risks, and (f) profit of the joint venture in proportion with the M/WBE ownership percentage. (Pl. Ex. 2, General Condition 32.) The County's M/WBE ordinance provides that credit for M/WBE compliance may be denied where the minority joint venture partner is found not to have "duties, responsibilities, management control, or risk in proportion to its joint venture ownership." County Code §10-43.6(B)(3)(a). This Court finds as a matter of fact that DD does not comply with the requirements of General Condition 32 or the County ordinance.

The Court further finds that the Affidavit submitted by DD in its bid, which was incorporated in the Contract (Pl. Ex. 4), falsely represented that DD was a joint venture, falsely described the agreements between Siemens and Faustech, falsely represented the work to be performed by Faustech, falsely represented that its members shared in the profits and losses in accordance with their ownership percentage, and intentionally concealed the side agreement. (*Id.*; Pl. Exs. 41, 42, 168; R. 260-65.) In assessing the bids for Bid Package #3, Ms. Perry testified that the County relied on the information set forth in the bids and assumed that the information contained therein was truthful, including the information contained in DD's bid. (R. 2293.)

26

<u>DD's Status as a bidder and contractor under Special Condition 21</u>.

As noted above, special conditions were specifically included in the bid specifications drafted by the County to ensure that the contractor performing Bid Package #3 would be experienced and qualified to do a "turnkey" job in providing and installing state-of-the-art electronic medical equipment. (Pl. Ex. 2, SC 21.) Contrary to Special Condition 21, DD has not been in business for ten years, has never installed a PACS system, has no expertise in project planning and installation services, and has no local and factory based service capability. (R. 115, 117, 120-21.)

At the May 23, 2000 meeting with Mr. LaMont, the Siemens and Faustech representatives requested guidance regarding how Special Condition 21's ten-year requirement would apply to a newly-formed joint venture. (Pl. Ex. 39; R. 242, 1870, 2038.) Mr. LaMont told them that the County would consider the entity holding the majority interest in a joint venture to be the primary bidder for purposes of Special Condition 21's 10-year requirement. (*Id*.) There is no evidence that Mr. LaMont discussed how Special Condition 21 would be applied to a limited liability company.

The County admitted that in order for it to conclude that DD satisfied SC-21, it had to treat Siemens – not DD – as both the Primary bidder and Contractor. (R. 1920-23.) But Siemens was not a "bidder" for the Contract because it did not submit a bid proposal, and the County admitted that Siemens does not fit the definition of "Contractor." (*Id*.)

DD encouraged the County to believe that it could look to Siemens to perform the Contract as a participant in a joint venture. DD intentionally identified the bidder on the contract as a joint venture, and minimized its status as a limited liability company for which Siemens has no liability. DD Industries submitted its bid in the name "Siemens/Faustech, a Joint Venture, a DD Industries, LLC, Company" (Pl. Ex. 4 at 5) and used the execution form for a partnership and/or joint venture (Pl. Ex. 4 at [unnumbered]29) rather than the execution form for a corporation. (Pl. Ex. 4 at 33.)

The cover letter to the County enclosing DD's bid is on letterhead of "Siemens/Faustech, a Joint Venture." In small print on the bottom of the page is the logo "a DD Industries Company" with no reference to the limited liability company. (Pl. Ex. 4 at 2.) The letter refers to Siemens and Faustech as "partners." (*Id.*)[11] It was signed not just by Mr. Desmond as president of DD but also by Mr. Villazan as president of Faustech and by Mr. Cohen on behalf of Siemens Medical Systems.

However, under the JV Agreement, Siemens has no liability for DD's obligations. (Pl. Ex. 21 §3.3.) Siemens does not even have a service agreement with DD obligating it to do work under the Contract. (R. 103.)

From its inception to date, DD has had only three employees: Messrs. Desmond, Brockman, and Villazan, the individuals designated in the JV Agreement as DD's sole officers and directors. (R. 120.) The $100,000 of start-up capital has not been touched, even though DD has supposedly been engaged in the build-out of the radiology department at the hospital for more than half a year. (R. 102.) Nor have any deposits been made to DD's account. (R. 102.)

The Court finds that DD does not comply with the requirements of Special Condition 21.

DD's execution of the bid.

Ms. Scully's review of the DD bid noted that it was not clear whether DD provided the proper signatures for the bid. (Pl. Ex. 20.) The Bid Package contained various execution forms that serve as both the execution of certain vendor certifications and of the bid proposal. (Pl. Ex. 2.)

---

[11] That DD was aware of the problem in calling a limited liability company a "joint venture" is evidenced by DD's assumed name applications. In its July 5, 2000 application to the Illinois Secretary of State for permission for an LLC to adopt an assumed name, DD stated that its assumed name would be "Siemens/Faustech," *not* "Siemens/Faustech, a Joint Venture." In contrast, the application to do business under an assumed name in Cook County, lists the assumed name as "Siemens/Faustech, a Joint Venture" and the owner(s) as Siemens and Faustech, and there is no mention of DD, the limited liability company. (Pl. Ex. 4 at 30.)

Although DD is a limited liability company, which is a corporate entity, DD submitted the execution form for a partnership and/or joint venture. (Pl. Ex. 6 at [unnumbered] 29.)[12] The Instructions to Bidders provide that "[if] the bidder is a partnership, all partners shall execute three (3) copies of the Bid Proposal unless one partner has been authorized to sign for the partnership, in which case satisfactory evidence of such authority shall be submitted." (*Id.* at IB-03.) The JV Agreement provides that without the "prior written consent of the other Member(s), no Member shall have the right or authority to bind either the Company ... or any other Member." (Pl. Ex. 21 at ¶ 6.1.) The JV Agreement further provides that "Members" are "Each Person that has executed this Agreement and whose name is listed on Schedule A," *i.e.*, Siemens and Faustech. (*Id.* at ¶ 2.5.) The JV Agreement between Siemens and Faustech thus requires signatures from authorized representatives of both Siemens and Faustech to bind DD.

DD's execution form was signed by Mr. Villazan, president of Faustech, and Mr. Desmond, who admitted that he did not sign the execution form on behalf of Siemens (R. 111) and did not have authority to do so. (R. 109-110.)

In his July 6, 2000 letter responding to Ms. Scully, Mr. Villazan explained that Reinhard Benditte is the person from Siemens who has "actual authority to bind Siemens Medical." (Pl. Ex. 44a.) Mr. Villazan explained that Mr. Benditte signed the JV Agreement and the Schedule B:

---

[12] The Bid Package also contained an execution form for corporations. (Pl. Ex. 2, PE-11) The bidding instructions provide, "If the bidder is a corporation, the President *and* Secretary shall execute three (3) copies of the Bid Proposal." (Pl. Ex. 2, IB-03, emphasis added.) Further, the execution form for corporations provides that "[i]n the event that the bid is executed by someone other than the President, three (3) certified copies of that section of the Corporate By-Laws or other authorization of the corporation which permits the person to execute the offer for the corporation shall be submitted." (*Id.*) Although Mr. Desmond signed the partnership/joint venture execution form as the President of DD, Mr. Brockman, the Secretary of DD did not. (Pl. Ex. 4.) DD did not submit any documentation authorizing someone else to execute the bid on DD's behalf.

Affidavit of Joint Venture because "[t]he Joint Venture Operating Agreement and [Schedule B: Affidavit of Joint Venture] would be invalid had it not been signed by an authorized officer of Siemens Medical." (*Id.*)

Following the opening of the bids, someone from the County called Mr. Villazan and advised him that the State's Attorney's Office would require DD to submit a second execution form containing the signatures of Reinhard Benditte and Richard Brockman, the Secretary of DD. (R. 111, 299.) The second form bearing the additional signatures was submitted by DD on July 7, 2000. (Pl. Ex. 7; R. 111-12.) The Court finds that DD's bid was not properly executed when it was submitted, and that proper execution was not submitted until July 7, 2000.

<u>DD's authority to do business in Illinois.</u>

Instructions to Bidders §IB-03 provided that "[c]oporations submitting proposals must be registered and in good standing with the Illinois Secretary of State." (Pl. Ex.2, IB-03.) GEMS interprets that as requiring that DD be registered prior to submitting its bid. The County cites the corporation execution form which states, "If the corporation is not registered in the State of Illinois, a current certificate of good standing is required from the State where your corporation is registered." (Pl. Ex. 4, PE-11 at 33.) The Order of Precedence of Component Contract Parts (Pl. Ex. 2, IB-24) states an order of precedence to govern in all cases of conflict or ambiguity. That order places the "Instructions to Bidders" such as IB-03, above the bid proposal, such as the execution pages, PE-11.

DD filed its Application for Admission to Transact Business in Illinois on July 5, 2000, thirteen days after the mandatory bid submission date. (Pl. Ex. 8.) On that application, DD stated that it first did business in Illinois "upon filing." (*Id.*) The Court finds that DD was not registered to conduct business in Illinois and in good standing when it submitted its bid on June 22, 2000.

<u>DD's WBE participation</u>.

Another issue regarding DD's bid that Ms. Scully identified in her July 28 memorandum to Ms. Perry related to DD's WBE, Progressive. Schedule C to DD's bid, the Letter of Intent For M/WBE to Perform as Subcontractor, indicated that Progressive would purchase all non-Siemens equipment, but, as discussed above, DD's cover letter stated that "[o]ver 95% of all the equipment proposed herein is manufactured by a single supplier, Siemens Medical Systems." (Pl. Ex. 4 at 2.) Ms. Scully questioned how Progressive could supply 10% of the contract value while providing less than 5% of the equipment. (Pl. Ex. 20; R. 57.)

On June 29, 2000, Mr. Desmond sent a letter to Mr. Rabin. (Pl. Ex. 10.) The letter asserted that Progressive would be supplying equipment worth $4,929,801 –10% of the bid amount. (*Id*.) An attachment identified the equipment as:

| Item Description | Manufacturer | Extended Cost |
|---|---|---|
| Radiotherapy Treatment Planning System | Adac | $ 223,798 |
| HDR Afterloader/Brachytherapy | Nucletron | 312,164 |
| Direct Digital Radiography Unit | Fischer | 2,503,310 |
| Radiographic Unit, Trauma, Digital | Fischer | 614,346 |
| Cystoscopy System | Liebel | 981,690 |
| R/F Unit Mobile, C-Arm, Mini | Fluorscan | 130,625 |
| Ultrasound, IVUS | Endosonics | 96,948 |
| Densitometer | Hologic | 66,920 |
| | TOTAL: | $4,929,801 |

(*Id*.)

However, the direct digital radiography equipment, identified in the above list as Fischer equipment, is manufactured by Siemens. (R. 205.) Mr. Desmond testified that "that line" of his letter was incorrect. (R. 205.) Progressive will not be providing Siemens' direct digital radiography equipment, valued at $2.5 million, to the County. (R. 206, 726). The County was unaware of this fact when it determined that DD was in compliance with the M/WBE requirements. (R. 64-65.)

DD's "unit price matrix" (a listing of the equipment to be provided and the cost of each piece) did not identify the manufacturer of the equipment to be provided. (Pl. Ex. 4 at 71-72.) When the Office of Contract Compliance required that DD provide some evidence of what commercially useful function Progressive would be performing, Faustech's staff literally whited-out quotations that had been sent to Faustech, typed in Progressive's name as the addressee, and submitted those patently false documents to the County. (Pl. Exs. 15-18, 270; R. 293-97.)

Without the value of the direct radiology equipment, Progressive's participation is less than half of its required amount. Although Mr. Desmond testified that Progrressive would be purchasing non-Siemens equipment having a value of $4.9 million (R. 212-13), there was no testimony as to what specific equipment Progressive could purchase of a value of $2.5 million to make up its required 10% participation. Given DD's position that the drawings necessary to integrate the equipment into the building are almost completed, it is not credible that Progressive is still identifying equipment. The Court finds that DD's bid did not comply with the requirement of 10% WBE participation.

GEMS' bid.

When the County reviewed GEMS' bid in June 2000 it concluded that GEMS' bid complied with the M/WBE rules contained in General Condition 32 and with the Contract's Special Conditions. (R. 97, 620, 1917-18.) DD and the County now contend that GEMS' bid was non-responsive in a number of respects. As discussed above, GEMS filed a motion in limine and made a continuing objection regarding any evidence relating to GEMS' bid as not relevant. DD and the County argued that GEMS' bid is relevant to GEMS' standing to bring this action, and to the likelihood that GEMS will succeed on the merits because GEMS must show that it submitted a

responsive bid. (See Conclusions of Law *infra*.) GEMS' motion in limine and continuing objection were overruled. However, the result was that more trial time and testimony was spent on the defendants' attacks on GEMS' bid than was spent on either attacking or defending DD's bid.

James Cavanaugh, Cook County account manager for GEMS, was primarily responsible for the GEMS bid. (R. 333-36.) He was assisted by Rodney Schutt, GEMS' Regional Manager. (*Id.*, 336-37.) Mr. Cavanaugh assembled GEMS' bid based on pricing and responses to technical specifications from GEMS' modiality specialists, i.e., the groups within GEMS that work on specific types of equipment. (R. 419-21.) He also made arrangements for the M/WBE participation. (R. 421.) Mr. Cavanaugh reported the progress of developing GEMS' bid on Bid Package #3 to his superiors on a "big deals" form. (R. 403.) Mr. Cavanaugh communicated to his superiors that the bidder with the lowest price that met technical specifications would win the bid. (R. 405-06; DD Ex. 230, 231.) He was concerned about GEMS' ability to respond to the technical specifications. (R. 418.) He was also concerned that there was a preference for Siemens among the decision makers. (R. 414-15.)

GEMS' execution of its bid.

DD and the County argue that GEMS' bid was not properly executed. Section IB-03 of the Instructions to Bidders provides:

> If the bidder is a corporation, the President and Secretary shall execute three (3) copies of the Bid Proposal. In the event that the bid is executed by someone other than the President, three (3) certified copies of that section of the Corporate By-Laws or other authorization of the corporation which permits the person to execute the offer for the corporation shall be submitted.

GEMS executed the Contract through Rodney Schutt by providing a certification authorizing Rodney Schutt to execute the Contract on behalf of GEMS. (DD Ex. 29 at page following PE-11.)

The authorization does not contain any statement precluding other authorized agents of GEMS from signing other portions of the bid.

DD and the County argue that GEMS' bid was not properly executed because Mr. Cavanaugh, not Mr. Shutt, signed a number of contractor's certificates and schedules contained therein. See, e.g., DD Ex. 29 at PE-4a. If that were a material variance, DD's contractor's certificates and schedules suffer from a similar deficiency because they were signed only by Mr. Desmond. (Pl. Ex. 4 at PE-4a; MF-5a.) Mr. Cavanaugh testified that he was authorized by GEMS to sign all portions of the bid other than the bid execution form. (R. 622, 654.) There was no evidence to the contrary. Furthermore, the execution form signed by Mr. Shutt contains a certification on behalf of GEMS that the contractor's certificates are true and correct, and that the execution of the bid shall stand as the bidder's execution of the contract. (DD Ex. 29 at PE-11.) That Mr. Shutt did not personally prepare the bid and relied on Mr. Cavanaugh's work in preparing the bid (R. 669) does not make the certification and execution less binding on GEMS.

Although GEMS did not acknowledge the receipt of Addendum No. 3 on its execution form, GEMS expressly acknowledged receipt of "all addendums," including Addendum No. 3, on page PE-1c of its bid. (DD Ex. 29 at PE-1c.) The Court finds that GEMS properly executed its Bid.[13]

GEMS' M/WBEs.

Mr. Cavanaugh originally considered supplying GEMS products through M/WBE subcontractors – i.e., having a subcontractor participate as an M/WBE by supplying GEMS products.

---

[13] GEMS' execution (DD Ex. PE-11) was stated to be conditioned on an Addendum and Supplemental Terms and Conditions Schedule that were omitted from the bid that GEMS submitted. (DD Ex. 43, 45.) Mr. Cavanaugh attempted to submit these conditions on June 28, 2000; however, Mr. Rabin refused to accept them, and they never became part of GEMS' bid. (R. 558-59.)

(R. 338.) He was informed by Mr. Rabin that GEMS could not satisfy the M/WBE requirements in that manner because it would be a pass through. (R. 339.) Instead, GEMS contracted with two MBEs, Ravenswood Medical Resources ("Ravenswood") and Medical Application Specialists ("MAS"); and two WBEs, Burnham Radiology ("Burnham") and Classic X-Ray ("Classic"). In general, these contractors were to provide all equipment GEMS could not directly supply and to provide certain services.

At the hearing, the County and DD questioned various witnesses at length and elicited the following evidence: (a) that GEMS initially submitted three of four letters of intent for its M/WBEs on its own forms rather than the Schedule C forms included in the Bid Package; (b) that the originally-submitted letters of intent and GEMS' Schedule D [M/WBE] Utilization Plan were incomplete in that they did not provide all the information requested on the Bid Package's Schedule C and Schedule D; and (c) that the letters of intent were signed by GEMS' WBEs before the service descriptions or dollar amounts were filled in.

It is undisputed, however, that the County allowed GEMS to re-submit completed Schedule Cs after the bid opening, pursuant to GC-32 IV.B, which provides that "all Schedule Cs must be submitted to the Contract Compliance Offices within three (3) business days after the date of the bid opening." (R. 619-20.) Mr. Rabin prepared an analysis of GEMS' bid with respect to M/WBE participation noting that he called Mr. Cavanaugh on June 26, 2000 and told him to resubmit the letters of intent. (DD. Ex. 150 at 2.)

The substituted Schedule Cs were signed and the parties bound themselves to their terms on June 27, 2000 — the third business day after the bid opening. (DD Ex. 151, 152, 153, 154; R. 1320-21, 1457, 1583-84, 2242; Basile Dep. at 89-91.) Mr. Cavanaugh testified that Mr. Rabin specifically allowed Mr. Cavanaugh to submit GEMS' Schedule Cs on June 28, 2000 — four business days after

the bid opening. (R. 619-20.) This conversation is confirmed in Mr. Rabin's memorandum. (DD Ex. 150 at 2.) Mr. Rabin accepted the completed Schedule Cs on June 28, 2000, told Mr. Cavanaugh that it was unnecessary to substitute a more complete Schedule D (presumably because the information absent on GEMS' Schedule D was contained in GEMS' Schedule C and elsewhere in GEMS' bid), and told Mr. Cavanaugh that GEMS' bid was compliant. (DD Ex. 151, 152, 153, 154; R. 617, 620-21.) Mr. Rabin was not called as a witness by either DD or the County, and Mr. Cavanaugh's testimony is uncontradicted.

Betty Hancock Perry, of the County's Office of Contract Compliance, testified that when her office reviewed the Schedule C forms submitted by GEMS, the forms were completed and not in blank. (R. 2285.) She further testified that the fact that an M/WBE signs a letter of intent before the specific dollar amount is filled in or the specific equipment is described does not make the bid noncompliant. (R. 2285-86.)[14] She admitted that the Office of Contract Compliance is looking to see that the dollar number of the M/WBE's participation totals the percentage that M/WBEs are supposed to have under the contract. (R. 2258-59.) She concluded at the time (June 2000) that GEMS' bid was compliant. (R. 97.) She only began to be concerned that there might be some question about GEMS' documentation after the lawsuit was filed. (R. 2261-63.)

The issue of whether GEMS' MBEs and WBE's were to perform commercially useful functions.

Achieving M/WBE participation totaling 40% of the contract price—i.e., $20 million of the approximately $50 million contract price—was a major problem for GEMS, as it was for Siemens. The difficulty is inherent in the nature of Bid Package #3 and the County's M/WBE participation

---

[14] Valerie O'Donnell, the President of Progressive, testified that she signed the Letter of Intent with DD before the dollar amount was filled in. (R. 723-24.)

requirements. That package was not a conventional construction contract. As noted above, Bid Package #3 specified state-of-the-art electronic medical equipment so sophisticated that very few bidders could supply it. The lion's share of the contract price is the cost of providing the equipment, as demonstrated by the fact that each bidder was required to provide a "unit price matrix," a spreadsheet listing the equipment to be supplied and the unit cost of each piece. *See* DD Ex. 29 at PE-1A; Pl. Ex. 4 at 71-74. The County also required that at least 60% of the equipment systems included in a bid be from the same OEM [original equipment manufacturer] or two strategically aligned co-partnered OEMs. (Special Condition 24, Pl. Ex. 2 at SC-15.) Because of the prohibition against "pass throughs," the M/WBE requirement could not be satisfied by having the M/WBEs provide the bidder's own equipment. In addition, as noted above, the required contract allowances for Walsh-Riteway and the County's design group totaling approximately $7 million were added into the bidder's contract total upon which the 40% was calculated, although those two entities were not themselves certified W/MBEs that would help meet the 40% goal.

Mr. Cavanaugh considered seeking a waiver. (DD Ex. 233.) However, seeking a waiver is not a real option. As Judge John Grady of this Court found in his decision declaring the County's M/WBE Ordinance unconstitutional, "The arduous, unrealistic waiver procedure affords no relief from the rigidity of the set-asides, nor did the drafters of the ordinance intend that it would." *Builders Ass'n of Greater Chicago v. County of Cook*, 123 F. Supp.2d 1087, 1116, (N.D.Ill. 2000).[15]

---

[15] The "indirect" method of participation is likewise unrealistic in this situation. It would require the bidder to purchase $20 million from certified M/WBEs within three months of the bid opening. (GC27 -III H.) Furthermore, indirect participation would only be considered by the County to the extent that the bidder demonstrates that it has included the maximum direct M/WBE participation achievable under the circumstances. (Schedule D Utilization Plan, Pl. Ex. 2 at PE-6b.) *See* Perry testimony, R. 2293-94, 2296. That would require the same "arduous, unrealistic" procedure required to achieve a waiver.

As discussed above, Siemens dealt with the MBE requirement through its arrangement with Faustech, and DD submitted a letter of intent relating to its WBE, Progressive. GEMS submitted letters of intent to engage its M/WBEs as subcontractors to supply products that would not come directly from GEMS and to perform services such that the total amount of the M/WBE participation met the required percentages. (R. 585, 587-88, 628-29, 646.)

In its letter of intent, Burnham bound itself to provide training for radiology equipment. (R. 1344.) Burnham was certified as a WBE to provide training for radiology equipment. (Pl. Ex. 51.) Although Barbara Burnham had not previously engaged in training on digital radiology equipment, Barbara Burnham testified that she would have obtained the necessary knowledge to provide training on digital radiology equipment as provided in her Schedule C. (R. 1318.) GEMS' other WBE, Classic, bound itself to service, install, and supply radiology equipment in its letter of intent. (Basile Dep. at 74, 92.) Classic was certified as a WBE (Pl. Ex. 51) to service radiology equipment and has experience in that area. (Basile Dep. at 14, 16, 126-140.)[16]

In its letter of intent, MAS bound itself to provide certain radiology equipment and project management services. (R. 1577-78, 1624.) MAS was certified as an MBE qualified to supply radiology equipment and medical consulting services (which include project management services). (Pl. Ex. 51, R. 1653-54.)

GEMS' other MBE, Ravenswood, also bound itself to provide certain radiology equipment, spare parts service, and equipment storage in its letter of intent. (R. 1419, 1498.) Ravenswood was certified as an MBE qualified to provide those services. (Pl. Ex. 51.)

---

[16] Because Jodell Basile was unavailable to testify, her deposition was admitted as evidence on the County's motion. (R. 1522-24.)

DD and the County argue that GEMS' bid was non-responsive because some of the equipment to be supplied by MAS and Ravenswood would be a "pass through." Among the radiology equipment MAS was to supply was all the Varian equipment. (R. 1624.) Included in the Varian equipment on GEMS' unit price matrix was an oncology CT Simulator costing $1,028,280 which is actually manufactured by GEMS. (DD Ex. 29, PE-1B; R. 1624.) GEMS had entered into a Product Marketing, Sales and Development Agreement with Varian under which Varian is the exclusive distributor for certain "Covered Products" including the CT Simulator when it is sold for use in an oncology suite. (DD Ex. 226; R. 341-42.) As a result, GEMS could not provide the CT Simulator directly. (*Id.*) Among the radiology equipment Ravenswood was to provide was a cystoscopy system and three R/F Units made by OEC, which is a GE company. (Pl. Ex. 51, PE-1A; R. 341-42.) Mr. Cavanaugh testified that the exclusive distributor for OEC equipment in this region is Core Medical, and as a result, GEMS could not directly provide the OEC equipment. (R. 341.) Ms. Perry testified that for the M/WBE to provide equipment it secures from a third-party distributor, even where that equipment is manufactured by the bidder, is not considered a pass through for purposes of the M/WBE requirements. (R. 2283.)

DD and the County question what "commercially useful function" would be served by the M/WBE participation proposed by GEMS. The pricing for the Varian equipment included in GEMS' bid was obtained by Mr. Cavanaugh, not by MAS' president George Brown. (R. 1576-77, 1625.) The use of M/WBEs to purchase non-GEMS equipment that GEMS could have purchased from the same vendors added a mark up which Mr Cavanaugh estimated at 10% of the cost of the equipment. (R. 543-44.) As another example, GEMS subcontracted training to a WBE, Burnham. To perform this service, Burnham would have to hire and train a staff to perform the service, and GEMS would have to train Burnham and these trainers. (R. 1318.) Burnham also had to agree to

39

provide training as needed, and to promise to provide whatever training the County needed. (Pl. Ex. 2 at SC-12.) Mr. Cavanaugh testified that a small WBE cannot provide training as economically as GEMS. (R. 358-60, 481-89.)

Mr. Cavanaugh testified that, by his estimation, the GEMS' bid was increased by approximately $5 million by the requirement of M/WBE participation. (R. 363-64.) DD cross-examined Mr. Cavanaugh on his estimate, which he admitted was "rough." (Pl. Ex. 69; R. 364-65, 524-44.) Although it is impossible to determine from the evidence how much M/WBE participation added to GEMS' bid price, the evidence establishes that GEMS' bid was substantially increased by the need to incorporate M/WBE participation at 40% of the contract total. *See discussion below.*

Whether or not the functions GEMS' MBEs and WBEs were to perform are commercially useful in a conventional economic sense, the evidence supports the conclusion that these functions met the definition of a "commercially useful function" for purposes of the County's M/WBE requirements.

Like the evidence relating to Progressive (DD's WBE), the details of the services that GEMS' M/WBEs were to provide to make up the difference between the cost of the non-GEMS equipment they were providing and the required participation were undefined. However, unlike DD and Progressive, these potential subcontractors were never awarded the Contract. As they testified, they had not thought about what services they had anticipated to provide pursuant to a bid that was a non-starter more than six months before their testimony. *See, e.g.* Burnham testimony, R. 1319. Also unlike Progressive, the equipment portion of the their letters of intent is not vulnerable to the "pass through" prohibition. In its letters of intent (Schedule C) submitted as part of its bid, GEMS committed itself to entering into a subcontract with each of its MBEs and WBEs if awarded the

Contract with the County. (DD Ex. 29 at MF-5a.) The Court finds that GEMS' bid was materially responsive to General Condition 32.

<u>The issue of GEMS' compliance with technical specifications.</u>

Bid Package No. 3 contained detailed technical specifications for each piece of medical equipment that the County sought to procure. (DD Ex. 243.) GEMS' bid contained exceptions to certain of the specifications, as did DD's bid. (DD Ex. 202, 240; R. 1752.) The County's bid instructions permit exceptions. (Pl. Ex. 2, IB-6.) Instructions to Bidders §IB-19 requires that the exact nature of the change and the reason therefore be identified, and provides that the County reserves the right to reject bids based on exceptions or deviations. (*Id.*) DD's exceptions to the technical specifications were accepted by the County. (R. 1127.) Thus, the question of whether GEMS' bid materially complied with the technical specifications cannot be determined solely from the fact that it contained exceptions. (R. 1077-78.) The County did not make a determination at the time the bids were under consideration whether or not GEMS' bid was materially compliant to the technical specifications. (R.1084-86.)

The County's Answer, Affirmative Defenses and Counterclaim to GEMS' Complaint, filed on January 12, 2001, do not allege that GEMS failed to comply with the technical specifications in Bid Package # 3. [Dkt #45.] The County's affirmative defenses allege that GEMS' bid was non-responsive "[b]ecause of material variances between the Plaintiff's bid and the MBE/WBE participation and documentation bid requirement." (County's Affirmative Defenses ¶59.) On January 29, 2001, the sixth day of the preliminary injunction hearing, the County admitted that it had never, even to that date, disclosed to GEMS any reason why GEMS' bid was not compliant with the technical specifications of Bid Package #3. (R.1122-24.) DD's Answer and Affirmative Defenses,

41

filed the same day as the County's, are virtually identical to the County's except that DD's contained an additional Paragraph 52 alleging that GEMS' bid contained material and substantial deviations from the specifications, and that unspecified "major pieces of equipment are completely different in design and function." [Dkt #43.]

As noted above, on December 7, 2000, this Court set a deadline of January 5, 2001, for the parties to provide Fed. R. Civ. P. 26(b) expert disclosures. (R. 1056-57; Minute Order (Dec. 7, 2000).) No party provided any such disclosures, and no party identified any expert witnesses to be called at the preliminary injunction hearing. Thus, up to the sixth day of the hearing, there had been no notice to GEMS of any specific ways in which its technical response to Bid Package #3 was materially non-responsive to the bid specifications.

On that sixth day, January 29, 2001, DD attempted to have Mr. Cohen testify as to his opinion about whether the exceptions taken by GEMS constituted significant deviations from the bid specifications. (R. 1055-1065.) However, neither DD nor the County had identified any expert witnesses or made any expert disclosure, and the County, which is the entity that determines whether an exception is material or not, did not allege in its Answer that GEMS' bid was noncompliant with the technical specifications and, even as late as the sixth day of testimony, had not identified any ways in which GEMS' bid was materially noncompliant with technical specifications. Therefore, this Court did not allow DD or the County to introduce any evidence regarding whether any alleged deviations in GEMS' bid from the technical specifications made its bid materially non-responsive. (R. 1064, 1072, 1125-27.)[17] Thus, no evidence was adduced indicating that GEMS' bid failed to

---

[17] This issue was argued at length by counsel for all parties. *See* R.1055-66;1077-1127; 1199-1203.

comply with the technical specifications in any material respect.[18] However, Mr. Cohen was permitted to testify about the differences between GEMS' bid and the technical specifications of Bid Package #3 and, in response to Mr. Cavanaugh's testimony, to testify as to how much lower DD's bid might have been had DD bid equipment at the level of GEMS' bid. (R. 1064-65, 1069-77, 1130-98.) *See discussion below.*

The record also reflects that for each piece of equipment that the County sought to procure, the technical specifications listed acceptable manufacturers (usually, three or four manufacturers). (DD Ex. 243.) For each acceptable manufacturer, the technical specifications identified an acceptable piece of equipment by brand name. (*Id.*) Although these identified pieces were only guidelines, if a manufacturer was deemed acceptable pursuant to the technical specifications, this meant that the County considered the quality of that manufacturer's product to be sufficient to satisfy the County's needs. (R. 1841.) It also meant that the manufacturer's equipment was sufficiently reliable to satisfy the County's needs. (*Id.*) The County had no preference among acceptable manufacturers; all acceptable manufacturers were of equal quality and reliability. (*Id.*) In short, if

---

[18] On the thirteenth and last day of testimony, the County made an offer of proof that, if permitted to testify, Irene Hillier, a medical equipment planner for the County's consultant, EQ International, would testify to the following: First, after the bid opening she and others on behalf of the County reviewed the DD bid and found it to be responsive to the technical requirements; second, that no technical review of the GEMS bid or the Toshiba bid was made at that time; third, that *during the week of January 22, 2001,* Ms. Hillier was requested to undertake a review of the GEMS bid to determine whether it was technically responsive; fourth, as a result of that review, she found the GEMS' bid to be non-responsive technically in a number of ways. (R. 2300-03, emphasis added.) GEMS' counsel pointed out that when Ms. Hillier's deposition was taken in November, 2000, she testified that she had not undertaken a technical review of the GEMS bid, and did not know anyone who had. (R. 2303.)

The fact that Ms. Hillier was not even requested to review GEMS' bid until after the hearing had begun reinforces this Court's decision that to have permitted evidence of technical non-responsiveness would have been extremely unfair to GEMS as well as contrary to this Court's order and F.R.Evid. 702.

a bidder proposed to supply equipment from the acceptable manufacturer's list, that equipment by definition materially complied with the technical specifications. Much of the equipment that GEMS proposed to supply was equipment identified as acceptable by the County in the bid specifications. (*Compare* DD Ex. 243 *with* DD Ex. 200, 201, 202.)

The Court finds that GEMS' bid was materially responsive to the technical specifications of Bid Package #3.

The issue of whether GEMS is a Cook County Taxpayer.

On the second day of the hearing, GEMS offered Pl. Ex. 263 into evidence without objection. (R. 322-23.) GEMS' counsel stated that Pl. Ex. 263 was a group exhibit containing evidence "of GE tax payments to Cook County." (R. 322.) Pl. Ex. 263 is comprised of form documents titled "Proof of Payment," apparently issued by the Cook County Tax Collector, purporting to confirm payments of first and second installments of 1999 real estate tax. The group exhibit contains 16 such documents, each for a separate real estate tax parcel in Cook County. The Proofs of Payment indicate the amount of first and second installment tax due for each parcel, and confirm that all payments were duly made. The Proofs of Payment further show an addressee that apparently is the business entity to which 1999 real estate tax bills were sent for the respective parcels. Of the 16 parcels, the documents list the following addressees: 1) GE PROPERTY TAX DEPT OR CURRENT OWNER, 333 Clay St 2300, Houston, TX 77002 (two parcels); 2) GE CAPITAL ATT TX DEPT OR CURRENT OWNER, 333 Clay Street 2300, Houston, TX 77002 (four parcels); 3) GENERAL ELECTRIC CBSI OR CURRENT OWNER, Tax Dept Box 60340, Ft Myers, FL 33906 (seven parcels); and 4) MONTGOMERY WARD & CO OR CURRENT OWNER, 535 W Chicago Av, Chicago, IL 60610 (three parcels).

GEMS laid no foundation for, and presented no witness testimony regarding, Pl. Ex. 263. Counsel for Cook County commented, "I think [Pl. Ex. 263 is] going to show they're established and doing business." (R. 322.) GEMS' counsel responded that the exhibit "establishes taxpayer standing in addition to our standing as a bidder." (*Id.*) The County's counsel replied, "Whatever it's being offered for, we have no objection to the document being admitted." (R. 323.) The record shows no indication that counsel for DD made any objection, and accordingly the Court admitted Pl. Ex. 263 into evidence. (*Id.*)

More than two weeks later, on February 9, 2001, after the conclusion of all witness testimony and again with no witness on the stand to lay a foundation, GEMS offered into evidence Pl. Ex. 305. Counsel for GEMS described this exhibit as "further information regarding GE status as a Cook County taxpayer." (R. 2354.) Counsel for DD immediately responded by offering into evidence DD Ex. 253, also with no witness on the stand to testify about the exhibit. (R. 2354.)

Pl. Ex. 305 is another group exhibit. Included in the group exhibit are copies of real estate tax bills for 1999 second installment payments on 14 properties. All of these documents indicate GE CBSI TAX DEPARTMENT OR CURRENT OWNER, or GENERAL ELECTRIC CBSI OR CURRENT OWNER as the apparent addressee. Pl. Ex. 305 also includes seven "Proof of Payment" documents for 1999 first and second tax installments. These Proof of Payment documents relate to seven of the 14 properties for which 1999 second installment bills are included in Pl. Ex. 305. In addition, Pl. Ex. 305 includes two copies of checks payable to "Cook County," dated March 1, 2000 and September 26, 2000. The March check is drawn on the account of "Client Business Services, Inc." of Fort Myers, Florida and indicates Client Business Services is the "Disbursing Agent for: GE CLIENT BUSINESS SERVICES, INC." The September check is drawn on the same account, and describes Client Business Services, Inc. as the "Disbursing Agent for: GE CORPORATE."

Pl. Ex. 263 and Pl. Ex. 305 refer to entirely different tax parcels. The two checks in Pl. Ex. 305 are in amounts substantially different from the total for the Proof of Payments on the 16 tax parcels in Pl. Ex. 263, and the check amounts are substantially different from the total for amounts billed or payments made indicated on the documents of Pl. Ex. 305. There is no information on the checks to indicate what these payments are for, other than the name of the payee, "Cook County."

According to DD's counsel, DD Ex. 253 purports to rebut Pl. Ex. 263 by showing that as of January 31, 2001, the record owner of the 16 properties GEMS lists in Pl. Ex. 263 is not the addressees indicated on Pl. Ex. 263's 1999 Proofs of Payment. (R. 2354-55.) Instead, the record owner is listed as "Great Oak, L.L.C." (DD Ex. 253, p. A1.) DD Ex. 253 consists of 19 pages of documents of a "Commitment for Title Insurance" from Chicago Title Insurance Company. The information in DD Ex. 253 as to the 16 tax parcels does not trace the chain of title, however. Instead, DD Ex. 253 shows real estate taxes are paid current for all 16 parcels (DD Ex. 253, p. B-1), and further lists various easements recorded against the properties (DD Ex. 253, pp. B-2 - B-14). There is no basis to determine from DD Ex. 253 whether the 16 parcels were owned by someone other than Great Oak, L.L.C. at the time when Pl. Ex. 263 indicates tax bills for these properties were being addressed to what appear to be various General Electric-related business entities. Hence DD Ex. 253 does not clearly rebut any inference that might be drawn from Pl. Ex. 263, either of GE ownership of Cook County real estate, or record of GE tax payments for such real estate.

The issue of whether GE is a Cook County taxpayer is clouded further by GEMS' bid proposal. (DD Ex. 29.) The bid proposal form required the bidder to list the "Permanent Index Numbers" for all real estate owned by the bidder in Cook County. The bid form instructed the bidder to enter the phrase "Not Applicable" if this information is "not applicable." In its bid, GEMS responded to this request by indicating "Not Applicable." GEMS representatives signed the

document under oath, attesting the truth of this statement. (DD Ex. 29, p. PE-11.) No trial testimony was directed at this ambiguous entry, hence it is not clear whether GEMS intended to attest that it (or GE generally) owned no real estate in Cook County, or whether it regarded the information request as "Not Applicable" for some other reason.

Neither GEMS nor DD had provided their new exhibits to opposing counsel prior to offering the documents into evidence. (R. 2355-56.) The Court entered and continued the motions of both GEMS and DD to admit, respectively, Pl. Ex. 305 and DD Ex. 253, directing the parties to file by February 16, 2001 any objections they had to the admissibility of the opposing party's proferred exhibit. The Court indicated it would incorporate decisions on these objections into its ruling on the request for injunctive relief. (R. 2356-57.) GEMS subsequently filed an objection to DD Ex. 253, and DD in turn filed an objection to both Pl. Ex. 263 and Pl. Ex. 305.

GEMS' objection to DD Ex. 253 is overruled, and DD's motion to reopen its case to admit that Exhibit is granted. However, as noted above, DD Ex. 253 does not conclusively refute GEMS' claim of taxpayer status. DD's untimely objection to Pl. Ex. 263 is denied. That Exhibit was admitted during the hearing without objection. DD's objection to Pl. Ex. 305 is sustained and GEMS' motion to reopen its case to admit that Exhibit is denied. GEMS did not provide timely notice to DD that it was claiming taxpayer status with respect to the additional parcels set out in Pl. Ex. 305. However, even if Pl. Ex. 305 were admitted, that Exhibit and Pl. Ex. 263 are insufficient to prove that GEMS or some other GE entity was a Cook County real estate taxpayer in the relevant period. There is no proof that a GE entity actually owned real estate in Cook County, but only the indication that 1999 real estate tax bills were addressed to entities with business names indicating they might be GE affiliates. Further, the two checks included with Pl. Ex. 305 do not correlate with the amounts due for real estate tax either as to the tax parcels listed in Pl. Ex. 263 or in Pl. Ex. 305.

Accordingly, this Court finds that, for purposes of this preliminary injunction hearing, GEMS has failed to establish that it has standing as a Cook County taxpayer to challenge Cook County's bid award.

<u>The issue of whether DD's non-compliance provided it with an economic advantage.</u>

As discussed above, Mr. Cavanaugh testified that complying with the M/WBE requirements added approximately $5 million to GEMS' bid. (R. 347-48.) For example, he testified that he looked in good faith to find services and goods that the M/WBEs could provide, even though GEMS could have provided those services more inexpensively, in order to meet the M/WBE requirements. (R. 356-57.) He testified that GEMS' bid included services that were not required by the specifications in order to reach the required MBE participation. (R. 537.) He acknowledged that his $5 million estimate was "rough." (R. 364-65.) His estimate that the M/WBEs' markup on equipment would be 10% was based on conversations with George Brown of MAS who agreed that MAS' mark up was 10%. (R. 543.) His estimate of the savings had GEMS provided training and storage was based on taking on half of the amount allocated to the M/WBEs for those services. (R. 542.) However, his testimony was credible as to his struggle in making a good faith effort to find $20 million worth of participation for M/WBEs, and supports the conclusion that GEMS' compliance with General Condition 32 added substantially to the total of its bid.

DD responded to Mr. Cavanaugh's testimony with the testimony of Mr. Cohen who prepared a chart of the differences between GEMS' bid and the technical specifications of Bid Package #3. (DD Ex. 244.) Mr. Cohen estimated that DD could have saved $4 million if it had bid to the exceptions taken by GEMS. (R. 1234, 1259, 1755, 1758-1808.) There were several fundamental problems with Mr. Cohen's estimate. First, the method by which he prepared it was not supported

by underlying material that was available to GEMS' counsel. When DD first sought to introduce this line of testimony, GEMS' counsel pointed out that chart had not been produced to GEMS in discovery. (R. 1266.) The Court recessed Mr. Cohen's testimony and directed DD to produce to GEMS' counsel all the documents upon which the chart was based. (R. 1270-71, 1275-78.) When Mr. Cohen's testimony resumed, he testified that his estimate had been prepared in various ways, by using a price book, by talking to engineers, and by other information that he had. (R. 1756.) Mr. Cohen acknowledged that parts of his estimate were not a "rigorous defensible analysis." (R. 1756.) Thus, instead of producing supporting material for the first estimate, during the recess Mr. Cohen had produced a second estimate, Pl. Ex. 303, that he prepared using Siemens' computerized "price book" which is not a physical document but a menu-driven program. (R. 1759-61.) That estimate was $6.7 million. (R. 1802.) Plaintiff's Exhibit 303 does not reflect the actual list price of the items, but reflects a discount that Mr. Cohen testified was essentially the same as given to the County. (R. 1762.) However, he acknowledged that there was no way in which GEMS' counsel could know whether what was reflected in Exhibit 303 was a list price or a discount price. (R. 1764.) DD's counsel was permitted to lay foundation for Exhibit 303. (R. 1776-91.) But Mr. Cohen could not produce a written version of the underlying process of which Ex. 303 was the result, nor could he testify as to the discount applied to any particular price. (R. 1793.) Mr. Cohen also testified that the method by which he prepared his estimates was not the method by which DD (in fact, Siemens) had prepared its bid. (R. 1796.) This Court denied GEMS' motion to strike Mr. Cohen's testimony about his first estimate (R. 1809, 1824), and ruled that Mr. Cohen's testimony about his second estimate and Plaintiff's Exhibit 303 (which was prepared after Mr. Cohen had finished his direct testimony), could not be used by DD for any substantive purpose, but rather was to be used only for

cross-examination purposes. (R. 1811, 1816.) It is apparent from the foregoing discussion that Mr. Cohen's first estimate is entitled to little, if any, weight.

More importantly, Mr. Cohen testified about how Siemens prepared the pricing for its bid to the County.

> [W]e actually used different–somewhat different ground rules in coming up with the pricing for the County bid. In order to be very aggressive we didn't use conventional discounting means. . . Basically what we did is, we used what is called a margin analysis, starting at base cost and adding cost of different items back in plus a certain desired target profit level for the total project. An then we spread profit by a– you know, by division. This is as opposed–this is different than the way I would normally price individual quotations, but it ends up with a certain effective discount level which I could estimate.

(R. 1794-95.)

This testimony demonstrates the economic advantage that Siemens obtained by structuring its M/WBE participation through the arrangement with Faustech. Because Siemens did not have to consider the problem of "pass through" except as to Progressive, Siemens was able to supply 95% of the equipment, instead of 60%. Siemens could use unconventional, "aggressive" methods of pricing for 95% of the equipment, and spread the profit throughout various divisions. GEMS' control over pricing, on the other hand, could extend over only its own equipment, which could not be more than 60% pursuant to the "pass through" rules. Likewise, Siemens did not have to be concerned with finding services that the M/WBE's (except Progressive) could perform, or with including in its pricing compensation to the M/WBEs for those services, except Faustech's $500,000 fee. The savings that Siemens thus achieved enabled its "aggressive" pricing. This aggressive pricing would not have been possible had Faustech truly been expected to receive 30% of the profit, as would have been the case if there had been actual compliance with the M/WBE ordinance.

As noted above, it is significant that Mr. Cohen, who testified on two different days following Mr. Villazan's testimony, did not present any testimony to respond to the evidence discussed above regarding the "side agreement" with Faustech. The absence of any reference to Faustech's purported 30% of the profit in Mr. Cohen's analysis of pricing further reenforces the conclusion that the side agreement was reached. The Court finds that DD's non-responsive bid gave DD a material advantage over GEMS.

DD's Motion to Strike Testimony and Exhibits.

On the last day of the hearing, DD filed a Motion to Strike Testimony and Exhibits, which asked the Court to strike evidence that DD argues was opinion evidence that should have been disclosed as expert opinion testimony. [Dkt # 76.] Specifically, DD seeks to have the Court strike Mr. Cavanaugh's testimony that GEMS' bid complied with the technical specifications of Bid Package #3, and about the amount of money GEMS would have saved on its bid if it had not had to comply with the M/WBE requirements, and testimony by GEMS witness Roy Angel regarding the lack of any delay that would occur if GEMS were substituted for DD as the radiology vendor. (DD's Mo. to Strike Testimony and Exhibits at 1.)

The Court denies DD's Motion. Mr. Cavanaugh's testimony about the technical specifications can hardly be characterized as expert testimony about a technical issue. Mr. Cavanaugh was the business person who put together GEMS' bid. He testified that he relied on GEMS' modality specialists to provide the technical information, which he assembled. The testimony cited by DD consists of Mr. Cavanaugh's statement that "he believes" that GEMS' bid materially complied with the bid specifications. (R.336, 616-17.) There was no objection at the time to the question or answer.

Mr. Cavanaugh's rough estimate of the cost of M/WBE compliance, described above, was likewise also not expert opinion testimony and has not been considered by this Court as such. Mr. Cavanaugh testified regarding what he did to assemble GEMS' M/WBE compliance; the conclusion that there was additional cost of some significant amount associated with that compliance can be drawn from the facts to which he testified without Mr. Cavanaugh's handwritten figures. In addition, as also discussed above, DD was permitted to present Mr. Cohen's testimony in response to Mr. Cavanaugh's testimony.

Finally, the testimony of Mr. Angel to which DD objects is one question at the conclusion of his testimony to the effect that he still believes that it is possible to have GEMS substitute as the equipment vendor without substantial delay. (R. 876-77.) Again, this question was asked and answered without a timely objection. DD and the County subsequently presented the testimony of Mr. Wierec and Mr. LaMont who testified at length regarding their contrary view. Neither Mr. Wierec nor Mr. LaMont had been disclosed as experts.

DD's Motion to Strike Testimony and Exhibits is denied.

Timing of the radiology unit build-out.

Dr. Bradley Langer, the Medical Director of Cook County Hospital, testified at length about the deteriorating physical condition of the old hospital building and the anticipated improvements in the new hospital building. (R. 2309-52.) The County also presented various photographs of current conditions of the old hospital building.[19] There really is no dispute that the new facility will provide significant improvements, although the current hospital was reaccredited in November 2000.

---

[19] The County's motion to seal these exhibits was granted because the photographs show individual patients at the hospital.

(R. 2352.) There is, however, a dispute as to the schedule for completion of the hospital, and about the impact of an injunction preventing the County from proceeding with the Contract with DD.

### 1. Status of the radiology build-out.

The weight to be given the testimony presented by the County and DD about the potential impact of an injunction is negatively affected by the differences of opinion within the County's team about the current schedule.

Michael LaMont, the Director of the Cook County Department of Capital Planning and Policy, testified that the new hospital is scheduled to be substantially completed on *February 15, 2002*, with the date for completion of the radiology department 30 days later. (R. 2041.) Mr. LaMont testified that the County is "targeting" opening the hospital for patients in summer, 2002. (R. 2042.) On the other hand, Daniel Wierec, the Senior Project Manager for Walsh-Riteway, the general contractor, testified that in 1998 when Walsh-Riteway was awarded the general contract, its schedule showed the hospital project to be substantially complete on February 15, 2002. However, the current schedule shows a substantial completion date at the *end of May 2002*. (R. 2157, 1689.) The original schedule also anticipated three to four months of testing and commissioning systems before February 2002. (R. 2158.) Mr. LaMont testified that after substantial completion, there will be a process of testing and inspection before the hospital can admit patients. (R. 2042.)

Walsh-Riteway was awarded the general contract for the hospital in February 1998. (R. 1685.) In September, 1999, the County issued a hold order to stop work on the radiology department until a specific radiology equipment vendor was selected. (R. 1690.) That was in order to design the area to incorporate the specific vendor requirements. (R. 1691.) The process of building out the radiology unit starts with receiving specific equipment drawings from the equipment vendor. (R.

1703.) When those are delivered to the County's architectural and engineering design team, the design team incorporates all of the structural, mechanical and electrical services necessary, and adjusts the dimensions of the rooms to accommodate the equipment. (R. 1703.) Construction begins when those architectural and engineering drawings have been finalized and approved for construction. (R. 1704.)

In late spring of 2000, Walsh-Riteway's schedule showed that the hospital construction was more than ten months behind, with substantial completion of the hospital not projected until *December 2002*. (R. 2087, 2200.) Walsh-Riteway prepared an eight point mitigation plan "to have the project have a chance of finishing on time." (R. 2200.) A construction mitigation plan is a way to work around or develop work sequences so the work can still be completed on time with a quality that suits the owner. (R. 2191.) One of the eight points involved the radiology department build-out. (R. 2200.) In August, 2000, Walsh-Riteway gave the County a deadline of November 1, 2000 for delivery of final construction drawings for the radiology department in order to make the scheduled substantial completion date. (R. 2194.)

Steve Duran, who is employed by Siemens and not by DD, is the Project Manager for Siemens on the hospital project. (R. 773, 775.) He attended his first project construction meeting in July 28, 2000. At that meeting a schedule was worked out under which final construction drawings would be prepared by the design team to be turned over to Walsh-Riteway on November 1, 2000. (R. 777, 780.) DD was directed to produce final equipment drawings in a series of productions between September 9 and September 29, 2000. (R. 782.) DD started to fall behind by its second milestone date, September 15, 2000. (R. 786.) By early to mid-December, less than five months after it started work on the project, DD was between two and three-and-a-half months behind schedule. (R. 847-48, 2092.)

A series of internal Siemens' e-mails acknowledges that the delays were attributable to the failure of various Siemens divisions and affiliates to perform. (Pl. Ex. 258, 259, 260, 261.) DD, however, told the County and its representatives that the source of delays was third parties, including other vendors and the Cook County design team. (R. 798, 810, 856.) On October 28, 2000, one day after Mr. Mark testified as quoted *above* on behalf of the County in the TRO hearing before the District Judge, Mr. Duran sent an e-mail to his colleagues at Siemens stating, "Siemens is LATE. . . The common denominator has been our own internal divisions. . . I cannot tell the Owner the truth, so I have started to make excuses and I'm not comfortable." (Pl. Ex. 259, capitalization in original.)

Mr. LaMont, testified that the County "refused to accept" Walsh-Riteway's spring 2000 projection that the project was ten months behind. (R. 2089.) The County has also "rejected" Walsh-Riteway's current projection of a May 28, 2002 substantial completion date. (R. 2090-91.) He admitted however, that on October 27, 2000, the date of the TRO hearing, the County was not five days away from beginning construction on the radiology section, and that "there was no factual basis" for the County to make such a representation to the District Court. (R. 2104.) In December, 2000, Walsh-Riteway projected that the radiology unit build-out *and other elements of the project* were three-and-a-half months behind schedule. (R. 2092.)

Mr. Wierec testified that as of early December 2000, Walsh-Riteway had one-third of the completed radiology build-out construction drawings, and as of the date of his testimony (February 2, 2001) Walsh-Riteway had the entire design except the MRI unit. (R. 1706.) From early December 2000 to early January 2001, no work was done on the radiology build-out. (R. 1702.) At the end of December 2000, Walsh-Riteway had about two-thirds of the information that it needed

to proceed, and submitted a request for authorization to the owner. (R. 2187-88.) Starting in early January, structural steel was beginning to be installed in the radiology build-out. (R. 1702-3.)

Mr. Wierec was anticipating preparing a mitigation plan for the build-out of the radiology department, and had had preliminary discussions with DD about such a plan. (R. 2180.) The mitigation plan for the radiology department might involve shift work or overtime work and getting more of the critical path tradesmen on the project and accelerating the work. (R. 2192.) On a large construction project, mitigation plans are more effective at the start or front end of the project, as opposed to the end or latter part of the project, because there is less flexibility at the end of a project due to the limited amount of work which remains to be completed. (R. 1698-99.) Walsh-Riteway is not currently working under a mitigation plan. (R. 2159.)

It was apparent from the testimony that the possibility–or even likelihood–that the new hospital will not open as scheduled was looming long before this lawsuit was filed and involves areas in addition to the radiology unit. The testimony of Mr. LaMont (the owner's representative) and Mr. Wierec (the general contractor's representative) at the hearing in this case was clearly shaped in part by the shadow of possible future litigation over which party bears the responsibility for any delays and the attendant cost overruns. For example, the fact that the County has "rejected" Walsh-Riteway's schedule showing that the construction will not be substantially completed by February 15, 2002 does not mean that the hospital will, in fact, be substantially complete on February 15, 2002. It means that the County is not accepting responsibility for any delay. In light of the conflicts between the County and Walsh-Riteway about scheduling, the County's position here, that if an injunction is not entered in this action the hospital is expected to be substantially completed as originally scheduled and admitting patients in Summer, 2002, is simply not credible. Unfortunately, that leaves the Court without reliable evidence about a reasonably foreseeable

schedule for completion of the hospital in the absence of an injunction here, the baseline against which any impact would be measured.

2.    The impact of an injunction.[20]

DD and the County presented evidence about the impact of a permanent injunction requiring that Bid Package #3 be rebid or an order that GEMS be substituted as the Contractor. This evidence was also negatively affected by the fact that none of the witnesses had analyzed what construction changes, if any, would be required if GEMS' equipment were substituted for Siemens' equipment, and by its speculative nature.

Mr. Wierec testified that the hospital completion could be delayed by 12 months or more if the radiology equipment vendor would have been changed as early as December 6, 2000. (R. 1710-11.) Mr. Wierec's testimony concerning delay was based on the assumption that it would take the County four to five months to approve a replacement vendor. (R. 1711-13.) He estimated that it would take a month for the vendor to design specific equipment drawings. (R. 1714.) The design team would need three to four months of time before they could produce buildable drawings. (R. 1715.) Any changes would have to be priced by subcontractors and submitted to the owner for approval. (R. 1715.) Mr. Wierec testified that the costs involved in changing the radiology equipment vendor could include both additional construction supervision for Walsh-Riteway and, if necessary, changing existing systems, such as structural supports and chilled water for equipment if the equipment needs were different. (R. 2174.) Mr. Wierec had not been provided with any

[20] In order to give effect to the agreed order regarding the "hiatus," which lasted 46 days, the witnesses were instructed to testify regarding the physical state of construction on the radiology build-out in early December, i.e., 46 days prior to the days of the hearing. However, the parties were also permitted to present testimony about the affect of an injunction or a change in bidders, and the testimony included evidence about the state of the construction at the time of the hearing.

information about what difference there would be in the build-out of the space if GEMS' equipment rather than Siemens' equipment were used. (R. 2197.) The impact on the schedule of a change is greater as time goes on. (R. 2185.) However, Mr. Wierec also testified that if the structural modification needed to be changed because the equipment vendor changed, the owner's design team would not wait until the entire design process was completed to direct the changes. (R. 2181.) He testified that it would make a difference in the schedule if the replacement vendor had already prepared its final drawings, by eliminating a month for vendor design. (R. 2163.) He had seen design drawings prepared by GEMS to integrate GEMS' equipment into the design of the radiology unit (DD Ex. 239), and he testified that GEMS' design drawings were detailed enough so that the County's design team could begin their work. (R. 2202.)

Mr. LaMont testified that if an injunction is entered on May 1, 2001 requiring rebidding of the contract, it would delay the opening of the new hospital by twelve months and push the opening to the Summer of 2003. (R. 2056-60.) Mr. LaMont's testimony provided a month-by-month analysis of the twelve month delay that an injunction would cause. (R. 2057-59.) However, Mr. LaMont did not have Walsh-Riteway or the County's design group analyze what delay would be involved. (R. 2086.) No one on behalf of the County was requested to create any detailed analysis of possible delays from an injunction. (R. 2086, 2103, 2198-99, 2201.) Mr. LaMont's testimony was based on the assumption that the radiology build-out would have to begin from scratch. (*Id.*) In his testimony regarding the delay involved in rebidding the contract, Mr. LaMont extended the time needed for every phase – Board approval, bidding, contract award, architectural drawing preparation – from that allotted initially in 2000, the first time the job was bid. (R. 2095-2102.)

Mr. LaMont's testimony about a lengthy, protracted rebidding and award process was at odds with Dr. Langer's testimony about the urgency of completing the radiology department so that the

new hospital can open. Mr. LaMont testified that if a rebid of the radiology equipment is ordered the County might even take the opportunity to have its equipment planners revisit and revise the specifications to get the most up-to-date equipment that would be then available. (R. 2093.)

There was some testimony from Dr. Dunne that it might be possible for the main portions of the new hospital to operate without final completion of the radiology unit, however, that would not be optimal. (R. 2023-26.) For purposes of this Report and Recommendation, this Court assumes that the new hospital would not be able to open without the completion of the radiology unit.

There is no doubt that a permanent injunction enjoining the County from proceeding with the Contract with DD and requiring either a rebidding of the contract or an award of the contract to GEMS would impact the construction schedule for the new hospital. However, because of the conflicts in the testimony about the current projected completion date, including the fact that there have been delays not attributable to this lawsuit, the lack of evidence as to specific changes that would be required by substituting GEMS' equipment for Siemens' equipment, and the possibility developing a mitigation plan to minimize delays, it is impossible to estimate the magnitude of that impact. Furthermore, there was no evidence that the delay imposed by a preliminary injunction pending a full trial on the merits would have any substantial impact, because DD and the County did not present evidence on that issue.

## CONCLUSIONS OF LAW

## GEMS'S MOTION TO AMEND ITS COMPLAINT

After the close of testimony, GEMS sought leave to file an Amended Complaint. [Dkt #83.] GEMS argues that its proposed amendments conform its pleadings to the evidence at the hearing. (Pl.'s Mot. to Am. its Verified Compl. at 2.) Specifically, GEMS seeks to add allegations that: (a)

GEMS has standing as a Cook County taxpayer to bring this suit; (b) the bid execution form that DD submitted with its bid proposal on June 22, 2000 was invalid; (c) DD engaged in fraud in the submission of its bid and fraudulently induced the County to award the Contract to it; and (d) DD failed to meet the "Contractor" experience requirements of the bid package. (*Id.*) GEMS states that it also wants to make more explicit its allegations that the County acted arbitrarily in awarding the Contract to DD, and that GEMS seeks to enjoin both the County and DD. (*Id.*) DD objects to GEMS' motion. (DD Industries, LLC's Opp'n to GEMS's Mot. Amend, dkt #96.)

DD argues initially that GEMS' motion should be considered under Rule 15(a) rather than Rule 15(b) because the preliminary injunction hearing was not the trial of the case. (*Id.* at 1.) A Rule 15(b) motion may be made based on issues tried at a preliminary injunction hearing. *Securities & Exchange Comm. v. Rapp*, 304 F. 2d 786, 790 (2d Cir. 1962); *Perry v. City of Fort Wayne*, 542 F. Supp. 268, 270, n.2 (N.D. Ind. 1982).

Under either subsection of Rule 15, the standard for leave to amend is a liberal one. Rule 15(a) expressly provides that "leave shall be freely given when justice so requires." The same liberality is applied to Rule 15(b) amendments. A complaint merely serves to put defendants on notice. It should be "freely amended or constructively amended as the case develops, as long as amendments do not unfairly surprise or prejudice the defendant." *Umar v. Johnson*, 173 F.R.D. 494, 503 (N.D. Ill. 1997). On the other hand, leave to amend may be denied if there is "undue delay, bad faith or dilatory motive on the part of the movant, . . . undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

DD asserts two grounds of objection. First, DD asserts undue prejudice with respect to GEMS' allegation that it has standing to bring this action as a taxpayer. (DD Industries, LLC's

Opp'n to GEMS's Mot. Amend at 1, n.1.) Secondly, adopting an argument made in its Post-Trial Memorandum [Dkt #87], DD asserts that the proposed amendments are futile because, DD argues, GEMS has no cause of action. Because the latter argument is important to DD's position with respect to the preliminary injunction as well as GEMS' proposed amendments, it will be considered first.

<u>DD's Argument that GEMS Has No Claim.</u>

DD's argument that GEMS' proposed amendment is futile is virtually identical to the argument in its Post-Trial Memorandum that GEMS lacks standing because it has asserted no cognizable cause of action. *Compare* DD's Post-Trial Mem. at 3-14 *with* DD Industries, LLC's Opp'n to GEMS's Mot. Amend at 4-14. In both arguments, DD is asking this Court to determine that GEMS' Complaint and Amended Complaint do not state a claim. DD's Post-Trial Mem. at 14; DD Industries, LLC's Opp'n to GEMS's Mot. to Amend at 14. DD asks this Court to recommend to the District Court that the case be dismissed. (DD's Post-Trial Mem. at 14.)

As noted above, the District Court denied the County's motion to dismiss GEMS' Complaint. DD was not a party to the case at that time, and chose not to intervene until after the motion to dismiss was denied. DD disagrees with the District Court's decision, and, in effect, asks this Court to determine that the District Court's decision was wrong. *See* DD's Post-Trial Mem. at 12-13; DD Industries, LLC's Opp'n to GEMS's Mot. Amend at 13-14. DD's argument fails to consider the deference that this Court owes to a decision of the District Court, as well as the doctrine of law of the case. *See Best v. Shell Oil Co.*, 107 F.3d 544, 546-47 (7th Cir. 1997.) Furthermore, there is no reason to recommend that the District Court dismiss the case, because GEMS' Complaint and Amended Complaint state a claim.

DD's argument has three premises. The first is that the County, as a home rule unit, is not bound by the Illinois statute that requires competitive bidding on contracts, and, therefore, GEMS cannot state a claim against the County for alleged violation of that statute. (DD's Post-Trial Mem. at 5-8.) The second premise is that the County is not bound by its own ordinances that require competitive bidding and the use of minority and women business enterprises, notwithstanding the fact that those ordinances were expressly incorporated in the bid specifications, because the award of the Contract to DD was a legislative act in which the County exercised a legislative prerogative to decline to follow its own ordinances. The third premise is that the requirements of Illinois common law– that bids must comply with the requirements in all material respects and that even an entity that reserves the right to reject or accept bids cannot arbitrarily exercise its discretion, which are stated in such cases as *Court Street Steak House, Inc. v. County of Tazewell,* 163 Ill.2d 159, 643 N.E.2d 781 (Ill. 1994)– do not apply to the County, a home rule unit. (DD's Post-Trial Mem. at 3-14.)

DD's first argument is based on *American Health Care Providers, Inc. v. County of Cook,* 265 Ill. App. 3d 919, 638 N.E.2d 772 (1994), and was argued by the County in its unsuccessful motion to dismiss. In *American Health Care,* the County obtained bids through a request for proposal ("RFP") rather than through competitive bidding. The RFP stated that the County reserved the right to accept or reject any or all proposals, and that the contract would be awarded by the County Board in its discretion. A disappointed bidder sued, claiming that the County violated the state statute requiring competitive bidding, 55 ILCS 5/5-36001, and the County's competitive bidding and M/WBE ordinances. The Appellate Court affirmed the Circuit Court's decision to dismiss the complaint, holding that the County, as a home rule unit, was not required to comply with the state competitive bidding statute, and that the County was free to choose not to follow its

competitive bidding ordinance. 265 Ill. App. 3d at 925-27, 930, 638 N.E.2d at 777-79, 780. The Court also found that the M/WBE ordinance did not confer a substantive right to be awarded the contract on the plaintiff as the only minority business enterprise responding to the RFP. 265 Ill. App. 3d at 923-24, 638 N.E.2d at 776. The Court stated, alternatively, that the County could support the award under the County's ordinance (Cook County Code §10-19) for contracts that are not adaptable to competitive bidding. 265 Ill. App. 3d at 931-32, 638 N.E.2d at 781.

As the District Judge stated in the Memorandum and Order denying the County's motion to dismiss (at 16), the present case is distinguishable from *American Health Care*. In *American Health Care*, the County never purported to be awarding the contract as a competitively bid contract that specifically incorporated M/WBE requirements. In contrast, as the District Judge noted, GEMS' Complaint alleges that the County violated not only the M/WBE ordinance but also the M/WBE requirements set forth in General Condition 32 of Bid Package #3. (Mem. and Order at 16.) Likewise, the County specifically incorporated its competitive bidding ordinance into the bid specifications. The Instructions to Bidders provides:

> This contract is a competitively bid public contract of Cook County government, subject to laws and ordinances governing public contracts.

Pl. Ex. 2, "Instructions to Bidders," IB-02. In this case, unlike *American Health Care*, the County expressly incorporated the requirements of its ordinances, including the competitive bidding ordinance, as part of the advertised requirements of the bids.

However, DD argues, GEMS cannot state a claim for violation of the ordinances, even if incorporated in the bid requirements, because the County is free to disregard its own rules by legislative act, which, DD claims, was what was done by the award of the Contract to DD. (DD's Post-Trial Mem. at 9.) DD argues, in effect, that the County, having advertised for bids requiring

63

compliance with the M/WBE ordinance, and having stated that the bids would be awarded on the basis of competitive bidding, and having induced various bidders to expend the substantial resources necessary to assemble a bid for a $50 million contract in reliance on the expectation that the contract would be awarded pursuant to the competitive bidding ordinance, is free to disregard the bid requirements, and the only recourse, "if at all, [is] through political processes." (DD's Post Trial Mem. at 14.) This is a questionable position as a matter of public policy, and is not supported by the authorities cited by DD or the record.[21]

DD relies on the decision of the Illinois Supreme Court in *Landmarks Preservation Council of Illinois v. City of Chicago*, 125 Ill. 2d 164, 531 N.E.2d 9 (1988), which DD interprets as "precluding enforcement. . . of the County's own bidding ordinance." (DD's Post-Trial Mem. at 9.) However, *Landmarks* does not support that proposition. The *Landmarks* case involved a 1984 ordinance passed by the Chicago City Council designating the McCarthy Building a landmark. The landmark preservation ordinance provided that such a designation could only be rescinded in the same manner as the original designation was made. In 1987, the City Council passed an ordinance expressly repealing the 1984 ordinance designating the McCarthy Building. The Illinois Supreme Court held that the court may invalidate an *ordinance* only on constitutional grounds or violation of a state or federal statute, which were not alleged. 125 Ill.2d at 179, 531 N.E.2d at 15. The Court noted that the plaintiffs did not allege that the disregard of the procedures in enacting the ordinance was unconstitutionally arbitrary. (*Id.* at 179-80.) The Court also noted that the Council was acting as a legislative body and not administratively.

---

[21] Significantly, in the present case only three bids were submitted, and one of those, Toshiba, was ineligible because it did not include a bid deposit. (Pl. Ex.46; DD Ex. 203, Bid Report dated June 22, 2000.) If DD's argument were correct, the pool of willing bidders might be further reduced.

The difference between the present case and *Landmarks* is apparent. In *Landmarks*, the Council made a legislative judgment to repeal a previous ordinance by the passage of another ordinance. Here, there is no suggestion that the County Board made an express legislative decision to repeal the County's competitive bidding ordinance or the M/WBE ordinance. Indeed, there is no support in the record for the conclusion that the County Board, in approving the Contract, explicitly or even implicitly decided to override either ordinance. On the contrary, the record supports the opposite conclusion. The Contract for Work approved by the County Board on August 9, 2000 included the Instructions to Bidders as part of the Contract Documents (Pl. Ex. 4 at P-E 2), and as noted above, those Instructions recited that this Contract was a competitively bid contract pursuant to the County's ordinances. There is no evidence of a legislative act in which the County decided to forego the requirements of its ordinances.

As the District Judge noted, competitive bids must conform to the advertised requirements of the invitation to bid, and bids that contain material variances must be rejected. (Mem. and Order at 16.) DD disagrees with that conclusion, arguing that the cases cited were ones in which the public entity had a clear statutory obligation to engage in competitive bidding. (DD's Post-Trial Mem. at 7.) However, as noted above, the County in this case incorporated its competitive bidding ordinance as part of the bid requirements and part of the Contract Documents.

DD's third argument–that a contract awarded by a home rule unit cannot be attacked on the ground that the accepted bid had a material variance or that the award was arbitrary–fails to consider *Bodine Elec. of Champaign, v. City of Champaign*, 305 Ill. App. 3d 431, 711 N.E.2d 471 (1999), which was decided after the *Landmarks* case. In *Bodine*, a low bidder whose bid did not include the 10% bid bond as required by the bid requirements and the city's ordinance sued when the city awarded the contract to the next lowest bidder. The city was a home rule entity. 305 Ill. App. 3d

at 433, 711 N.E.2d at 473. The appellate court affirmed the decision of the circuit court to dismiss the complaint, and cited the Illinois Supreme Court's decision in *Court Street Steak House, supra*, 163 Ill.2d 159, 643 N.E.2d 781. Although the appellate court noted the discretion afforded a home rule unit in determining when a variance is material, the appellate court further stated that if the city had waived the bond requirement, "the City would then have been in the difficult position of characterizing one of its ordinances. . . as a formality." 305 Ill. App. 3d at 440; 711 N.E.2d at 477. The court further commented that if the city had awarded the contract to the plaintiff, the next lowest bidder could have sued, asserting that the city violated its own ordinance by waiving a material variance, citing *Leo Michuda & Son Co. v. Metropolitan Sanitary District of Greater Chicago*, 97 Ill. App. 3d 340, 422 N.3d 2d 1078 (1981), as authority. There is no suggestion in *Bodine* that the city as a home rule unit would be free to award a contract to a bidder that had a material variance from the bid requirements. On the contrary, the appellate court there specifically discussed as authority the cases that DD dismisses as inapplicable to home rule units. 305 Ill. App.3d at 435-36; 711 N. E.2d at 475.

GEMS' Amended Complaint, like its original Complaint, is not futile for failing to state a cognizable claim.

## DD's Argument of Undue Prejudice.

DD's argument that it will be unduly prejudiced by GEMS' proposed amendments is limited to GEMS' allegation it has standing as a taxpayer of Cook County to challenge the award to DD. *See* DD Industries, LLC's Opp. to Mot. to Amend at 1, n. 1. GEMS argued that it had standing as a taxpayer as early as its Memorandum in Opposition to the County's motion to dismiss [Dkt #26] at 17, which was filed on November 21, 2000. As discussed *above*, the issue was the subject of

argument and evidence by GEMS and DD at the hearing. On January 23, 2001, when GEMS offered Pl. Ex. 263, stating that it was offered to show GEMS "taxpayer standing," neither defendant objected that the evidence of GEMS' status as a taxpayer was outside the scope of the pleadings.

Where both parties address an issue at a preliminary injunction hearing, that issue is treated pursuant to Rule 15(b) as if it had been raised in the pleadings. *Perry*, 542 F. Supp at 270, n 2. Although this Court has found the GEMS' evidence at the preliminary injunction stage did not demonstrate its standing as a taxpayer, GEMS may be able to present additional evidence later in the case.

The defendants have not demonstrated that GEMS' proposed amendments are futile, or that the defendants will be unduly prejudiced by the amendment. Therefore, GEMS' Motion to Amend Its Verified Complaint is granted, and GEMS is granted leave to file its Amended Complaint.

## STANDARDS FOR GRANTING A PRELIMINARY INJUNCTION

A party seeking to obtain a preliminary injunction must demonstrate: (1) its case has some likelihood of success on the merits; (2) that no adequate remedy at law exists; and (3) it will suffer irreparable harm if the injunction is not granted. If the court is satisfied that these three conditions have been met, then it must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied. Finally, the court must consider the public interest (non-parties) in denying or granting the injunction. . . . This process involves engaging in what we term the sliding scale approach: the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position.

*Ty, Inc. v. Jones Group*, 237 F.3d 891, 895 (7th Cir. 2001) (citations omitted).

<u>I. GEMS has demonstrated that its case has some likelihood of success on the merits</u>.

1.      <u>The applicable legal standard</u>.

The issue of the likelihood of success on the merits comes into play at several points in this analysis. "Initially, the court only needs to determine that the plaintiff has some likelihood of success on the merits. However, at the balancing stage, the court must determine how great the moving party's likelihood of success on the merits is in order to properly balance the potential harms." *Ty, Inc.*, 237 F.3d at 895. DD and the County contest the issue of whether GEMS has a likelihood of success on the merits.

Citing *Illinois Psychological Assn. v. Falk*, 818 F.2d 1337, 1340 (7th Cir. 1987), the defendants argue that GEMS is attacking a home rule unit's authority and therefore GEMS must prove that it has "a good chance" not merely a better than negligible chance of success on the merits. (DD's Post-Trial Mem. at 30-31; County's Proposed Findings of Fact at 51-52.) The continued vitality of the standard in *Illinois Psychological Assn.* has been questioned in light of more recent Seventh Circuit cases applying the "better than negligible" standard. *See* cases cited in *Illinois Sporting Goods Assn. v. County of Cook*, 845 F. Supp. 582, 586 n.4 (N.D.Ill. 1994). In addition, the issue in this case is different from that involved in *Illinois Psychological Assn.* GEMS is not asking the Court to enjoin a state regulation but rather the award of a contract. Finally, under either standard, GEMS has shown a likelihood of prevailing on the merits.

2.      <u>GEMS' standing to bring this action</u>.

DD argues that GEMS cannot show a likelihood of success on the merits because, it argues, GEMS has no standing to bring this action. (DD's Post-Trial Mem. at 15-17, 33-67.) DD argues that to bring an action under Illinois law attacking the award of a contract, GEMS must show that

it is the lowest responsible bidder with a responsive bid, which it claims GEMS cannot demonstrate. This argument was the basis for DD's Motion for Disposition on Partial Findings. [Dkt #62.] Because this Court finds that GEMS has standing to bring this action and a likelihood of success on the merits, this Court respectfully recommends that DD's Motion for Disposition on Partial Findings be denied.

As an initial matter, the District Judge in the Opinion and Order denying the County's motion to dismiss previously rejected the argument that GEMS did not have standing to bring this action. (Order, Dec. 28, 2000 at 19.) The defendants argue that this Court has a continuing obligation to examine whether plaintiff has proven facts establishing standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992); *Training Institute, Inc. v. City of Chicago*, 937 F.Supp. 743, 753 (N.D.Ill. 1996).

In this action brought under diversity jurisdiction asserting rights under Illinois state law, GEMS' standing is determined by Illinois law. *AT/Comm, Inc. v. Illinois State Toll Highway Authority*, 1997 WL 222875,*3 (N.D. Ill. 1997). The Illinois Supreme Court has noted,

> [T]o the extent that the State law of standing varies from Federal law, it tends to vary in the direction of greater liberality; State courts are generally more willing than Federal courts to recognize standing on the part of any plaintiff who shows that he is in fact aggrieved by an administrative decision.

*Greer v. Illinois Housing Development Auth.*, 122 Ill.2d 462, 491, 524 N.E.2d 561, 574 (1988).

Under Illinois law, the purpose of the standing requirement is to assure that the issues are raised only by those parties with a real interest in the outcome of the controversy. *Glisson v. City of Marion*, 188 Ill.2d 211, 221, 720 N.E.2d 1034, 1039-40 (1999). The plaintiff must show injury in fact to a legally cognizable interest. (*Id.*) The injury may be actual or threatened, and must be (1)

distinct and palpable; (2) fairly traceable to the defendant's actions; and (3) substantially likely to be prevented or redressed by the grant of the requested relief. (*Id.*)

The defendants argue that Illinois law requires GEMS to prove that it is the lowest responsible bidder with a responsive bid in order to have standing. (DD's Post-Trial Mem. at 17.) Under defendants' approach, if GEMS fails to demonstrate that its bid was responsive to the specifications, GEMS lacks standing to challenge the award to DD and the case must be dismissed.

Illinois law with respect to the standing of disappointed bidders does not support the defendants' view. Initially, under Illinois law, lack of standing is an affirmative defense as to which the defendant bears the burden of proof. *Glisson*, 188 Ill.2d at 220, 720 N.E.2d at 1039; *Greer*, 122 Ill.2d 462, 494, 524 N.E.2d 561, 575. Furthermore, although some of the cases discussing standing occasionally phrase their discussion in terms of giving standing to "lowest responsible bidders," the rule urged by defendants here – to deny standing to aggrieved bidders who are unable to prove that they are the lowest responsible bidder – is not supported by the case law. *See, e.g., Young v. Village of Glen Ellyn*, 120 Ill. App.3d 692, 694-95, 458 N.E.2d 1137, 1138 (1983) (third lowest bidder had standing to challenge the award); *AIRCO, Inc. v. Energy Research & Develop. Admin.*, 528 F.2d 1294, 1296 (7th Cir. 1975) (holding that "disappointed bidders have standing" to challenge a contract award); *AT/Comm., Inc. v. Illinois State Toll Highway Authority*, 1997 WL 222875 *3 (N.D. Ill. Apr. 24. 1997) (same).

As DD acknowledges (DD's Post-Trial Mem. at 16), the unsuccessful bidder's standing to challenge the award of a competitively bid contract is derived from the fiscal purpose of competitive bidding statutes:

> [A] principal purpose of [competitive bidding] provision[s] is the protection of the taxpayers. . . . Nevertheless, the statute does establish procedures benefitting the bidders as well. . . . The duty to award the contract to the lowest responsible bidder

is owed both to the taxpaying public and to the bidders, who are made an integral part of the statutory scheme. As a practical matter, securing compliance with the statute, and thereby the benefits to the taxpayers, will be more effectively handled by unsuccessful bidders. . . . We find that the unsuccessful lowest responsible bidders are within the zone of protection afforded...and where the Board violates the section by awarding a contract to another bidder the unsuccessful lowest responsible bidder has standing to challenge that action.

*Cardinal Glass Co. v. Bd. of Educ. of Mendota Cmty. Consol. Sch. Dist. 289*, 113 Ill. App. 3d 442, 446-47, 447 N.E.2d 546, 549 (1983).

In *Court Street Steak House*, the Illinois Supreme Court discussed the reasoning behind the Appellate Court's decision in *Cardinal Glass Co.*:

In *Cardinal Glass*, the court held that an unsuccessful bidder for a public contract has standing to sue for injunctive and *mandamus* relief. The court reasoned that unsuccessful bidders could more effectively ensure compliance with the statute than could taxpayers because bidders have a greater interest at stake than do taxpayers. The court therefore concluded that allowing an unsuccessful bidder to sue would promote tax savings.

*Court Street Steak House*, 163 Ill.2d at 168-69, 643 N.E.2d at 785-86. *Cardinal Glass* and *Court Street Steak House* use both terms, "unsuccessful bidder" and "lowest responsible bidder."

The factual showing required to support standing for a preliminary injunction must also be read in harmony with the Illinois Supreme Court's rejection of any test for standing that "confus[es] the issue of standing with the merits of the underlying suit." *Glisson*, 188 Ill.2d at 221, 720 N.E.2d at 1040. The defendants' argument would require that GEMS prove that its bid is responsive or have its lawsuit dismissed for lack of standing at the preliminary injunction stage, where the plaintiff's burden is only to show a likelihood of success on the merits and where discovery has necessarily been limited. This would effectively turn the preliminary injunction hearing into a trial on the merits of the disappointed bidder's bid, instead of a preliminary showing on the allegations relating to the

award to the winning bidder. That is exactly what the defendants attempted to do at the hearing in this case.

There is also a fundamental unfairness to the defendants' approach that is demonstrated by the facts in this case. The County never declared that GEMS' bid was non-responsive until after the lawsuit was filed. Ms. Perry testified that, *prior to the filing of the lawsuit*, the County found GEMS' M/WBE submission responsive. (R. 2263.) Mr. Cavanaugh testified that he was advised by Mr. Rabin on June 28, 2000 that the M/WBE portion of GEMS' bid was compliant, and there was no evidence to rebut that testimony. (R. 619-20.) The County's practice is not to review the technical responsiveness of any bid except the winning bid. The County never stated prior to the filing of the lawsuit that GEMS' bid was non-responsive technically, and *even as of the sixth day of the hearing,* the County had not identified to GEMS any way in which GEMS' bid was technically non-responsive. In *Callaghan Paving , Inc. v. City of Chicago*, 1992 WL 159313 (N.D. Ill. 1992), cited by DD in its Motion for Disposition on Partial Findings at 8, the City's purchasing agent advised the plaintiff in writing before the lawsuit was filed that the city found the plaintiff's bid non-responsive and the reasons for that decision. 1992 WL 159313, *3. The defendants' argument here that *after the lawsuit has been filed and while the trial is underway* the County may deprive the plaintiff of standing by exercising the County's discretion to decide that the plaintiff's bid was non-responsive must be rejected.

The test for standing in Illinois requires that the plaintiff show a distinct and palpable injury, fairly traceable to the defendants' actions and *substantially likely* to be prevented or redressed by the requested relief. *Glisson*, 188 Ill.2d at 221, 720 N.E.2d at 1040. This Court concludes that GEMS has standing to maintain this action and to obtain preliminary relief.

### 3. GEMS' likelihood of success on the merits.

### a. The "merits".

The parties contest what "merits" GEMS must show it has some likelihood of achieving. Citing *Ferrel v. HUD*, 186 F.3d 805 (7th Cir. 1999), DD and the County contend that GEMS must show that it is likely to be awarded a writ of mandamus, which they claim is the ultimate relief GEMS seeks in the lawsuit. GEMS contends that it need only show that it is likely that an injunction will be entered enjoining the County and DD from proceeding with the Contract. GEMS' Complaint and Amended Complaint seek the same relief, i.e., declarations that: (a) DD's bid was non-responsive and DD was not a responsible bidder; (b) that the Contract is void; and (c) that GEMS was the lowest responsible bidder and the Contract should have been awarded to GEMS; and preliminary and permanent injunctions against the County and DD from performing the Contract.[22]

Even if the Court were ultimately to determine that GEMS' right to be awarded the Contract is not clear enough to grant a writ of mandamus, the Court could enter an injunction enjoining the County from proceeding with the Contract on the ground that the award to DD was arbitrary and the product of fraud on the County, as illustrated by *Young v. Village of Glen Ellyn, supra,* 120 Ill.App.3d 692,458 N.E.2d 1137. In *Young,* various taxpayers and an unsuccessful bidder (the third lowest bidder) sought an injunction against the performance of a contract and a declaration that the contract was null and void. (*Id.* at 1138.) The trial court entered the injunction and granted

---

[22] The case cited by DD, *Ferrell v. HUD,* 186 F.3d 805 (7th Cir. 1999), concerns unusual factual and procedural circumstances that have no parallel in the present case. To the extent *Ferrell* can be applied at all, however, *Ferrell* supports GEMS, not DD. The *Ferrell* decision emphasizes that in analyzing likelihood of success on the merits, the court must focus on the ultimate issue raised by the plaintiff's request *for injunctive relief,* not on ancillary issues. (*Id.* at 811.) In the present case, the ultimate issue of GEMS' request *for an injunction* is whether the County's contract with DD is invalid, and accordingly whether defendants should be enjoined from performing that contract.

summary judgment declaring the contract void. (*Id.*) Although the appellate court reversed because the utility contract at issue was exempt from the competitive bidding ordinance, the court specifically affirmed the right of the unsuccessful bidder to bring the action. (*Id.* at 1139.) Thus, the right to bring an action to have an improper contract enjoined cannot be dependant on the unsuccessful bidder's seeking or obtaining a writ of mandamus directing the award of the contract to it. In *State Mechanical Contractors, Inc. v. Village of Pleasant Hill*, 132 Ill. App.3d 1027, 1030, 477 N.E.2d 509, 511 (1985), the appellate court discussed the *two* traditional remedies available to a disappointed bidder: injunctive relief and declaratory relief. The court noted that in *Stanley Magic-Door, Inc. v. City of Chicago*, 74 Ill. App.3d 595, 393 N.E.2d 535 (1979):

> [t]he appellate court concluded that, even though the plaintiff had not alleged that it was the one who should have been awarded the contract, the complaint showed that the plaintiff had a sufficient right affected to have standing to seek the declaratory judgment.

*State Mechanical Contractors,* 132 Ill. App.3d at 1030, 477 N.E.2d at 511.

Although not Illinois authority, *Platt Elec. Supply, Inc. v. City of Seattle*, 555 P.2d 421 (Wash. App. 1977), considered a similar situation. In *Platt*, the aggrieved bidder sought to enjoin performance of a public contract. The public entity and successful bidder urged that the aggrieved bidder lacked standing because its bid contained the same alleged deficiency as the successful bidder's bid. *Platt*, 555 P.2d 431. The appellate court rejected that argument:

> Were the issue whether [the successful bidder] or [the aggrieved bidder] is entitled to the contract, that might well be correct. The ultimate issue in the present case, however, is not whether [the successful bidder] or [the aggrieved bidder] is entitled to the . . . contract, but whether the contract entered into between the [public entity] and [the successful bidder] is illegal and should be enjoined.

(*Id.*)

The right of an unsuccessful bidder to seek declaratory and injunctive relief as a remedy separate from a claim for a writ of mandamus is consistent with recognizing that unsuccessful

74

bidders have a particular incentive to ensure compliance with competitive bidding laws. *See Court Street Steak House,* 163 Ill.2d at 168-69, 643 N.E.2d at 785-86, quoted *supra.* As in *Young* and *Platt,* GEMS' motion for a preliminary injunction seeks to stop performance of the Contract, not to have the Contract awarded to GEMS. An injunction against the County's Contract with DD is one form of ultimate relief sought in GEMS' complaint that is not dependant on GEMS' ability to show that it is entitled to mandamus.

      b.      <u>GEMS has some likelihood of obtaining declaratory relief.</u>

In any event, as set out in the foregoing Findings of Fact, this Court has found that DD's bid was materially non-responsive to Bid Package #3, that GEMS' bid was materially responsive, and that DD's non-compliance with the bid specifications and County's ordinances provided it a competitive advantage. This Court concludes that GEMS has shown *some* likelihood that it will succeed in obtaining a declaration that it was lowest responsible bidder with a responsive bid.

      c.      <u>The decision in the *Builders Ass'n* case holding the County's M/WBE Ordinance unconstitutional.</u>

DD argues that its bid cannot be held non-responsive for failure to comply with the County's M/WBE ordinance because that ordinance has been held unconstitutional by Judge John F. Grady in his decision in *Builders Ass'n of Greater Chicago v. County of Cook,* 123 F. Supp.2d 1087 (N.D.Ill. 2000). DD claims that GEMS is "trying to circumvent Judge Grady's decision by enforcing the ordinance through the back door." (DD's Post-Trial Mem. at 25.) It must be noted that the County has filed a notice of appeal from that decision. But, more importantly, "intra-court comity" is not violated by finding DD's bid non-responsive. This Court is not failing to follow Judge Grady's decision. Rather, this Court is finding that DD's bid was non-responsive to the

requirements of Bid Package #3, which included compliance with the ordinance. GEMS' bid price was increased because of its compliance with the M/WBE requirement of Bid Package #3, while DD received an economic advantage by its evasion of that requirement. As noted above, an objective of competitive bidding laws is to create a level playing field. It would be arbitrary for the County to waive that requirement for DD alone, retroactively. If the requirement of complying with the ordinance is to be waived for DD because of the decision in the *Builders Ass'n* case, that requirement should be waived for all bidders, and Bid Package #3 should be sent out again for rebidding.

    d.    <u>GEMS has some likelihood of obtaining injunctive relief.</u>

Furthermore, GEMS has shown considerably more than *some* likelihood that it will succeed in obtaining an injunction prohibiting DD and the County from proceeding with the Contract, on the ground that the Contract was the product of fraud and that the County's action in awarding the Contract to DD was arbitrary.

First, DD's Affidavit that it fulfilled General Condition 32 by a joint venture, and DD's failure to reveal the side agreement worked a fraud on the County. Secondly, the County has admitted that in awarding the Contract to DD it was looking to Siemens, not DD, to fulfill the specially-drafted requirements of Special Conditions 21. (R. 1905-06.) Ms. Melas testified that DD standing alone does not meet the requirements of Special Conditions 21. (R. 1920.) However, in fact, Siemens has no obligation under the Contract beyond its $70,000 capital contribution to DD. As noted above, the JV Agreement specifically limits the liability of the members, Siemens and Faustech, and provides that the members have no individual liability. Siemens did not provide the County with a guarantee of DD's obligations. DD does not even have a service agreement obligating Siemens to provide the equipment required by the Contract. This is not a hypothetical concern, as

evidenced by the internal Siemens e-mails of October, 2000. (Pl. Ex. 259.) As those e-mails state and as Mr. Duran testified, a reason why he could not obtain the drawings that DD had promised the County was the fact that one Siemens division had decided to stop its work because it had not received a signed commitment from Siemens Medical. (R. 811-12; Pl. Ex. 259.)

The County has no legal right to make Siemens or any of its divisions perform the Contract. It has only a contract right of action against DD, a shell limited liability company with $100,000 of assets.

Siemens and Faustech described their arrangement as a joint venture, but it is not a joint venture.

> A joint venture is an association of two or more persons to carry out a single enterprise for profit. A joint venture is not regarded as identical with a partnership, although, as a practical matter, the only distinction between the two entities is that a joint venture relates to a single specific enterprise or transaction while a partnership relates to a general business of a particular kind. Partnership principles govern joint ventures. . . . A joint venture, like a partnership, is liable to third persons for wrongful acts of its venturers done in the course of the joint venture agreement.

*Groark v. Thorleif Larsen & Son, Inc.*, 231 Ill. App.3d 61, 66, 596 N.E.2d 78, 82 (1992), citations omitted. A significant feature of a joint venture is the individual liability of the venturers for the acts done in the scope of the venture. "Every member of a joint venture is liable to third persons for acts of his fellow ventures done in the course of the enterprise." *Tassan v. United Development Co.*, 88 Ill. App.3d 581, 588, 410 N.E.2d 902, 908 (1980) (holding that if the plaintiff could show a joint venture between a developer and contractor, the contractor would be jointly liable for the developer's breach of implied warranty of habitability.) *Accord Baker Farmers Co. v. ASF Corp.*, 28 Ill. App.3d 393, 395-96, 328 N.E.2d 369, 372 (1975). This follows from the nature of a joint venture as a partnership for a single purpose. *See* Illinois Uniform Partnership Act, 805 ILCS 205/15: A partner is jointly and severally liable for the debts and obligations of the partnership.

DD admits that "[a]ll of the County witnesses who were involved in the review of the DD

bid testified that they viewed the bid as the bid of a joint venture." (DD's Post-Trial Mem at 71.)

If Siemens/Faustech was, in fact, a joint venture, there would be a sharing of profits and Siemens

would have responsibility for the acts of the venture and for Faustech's acts in the course of the

venture. In contrast, the purpose of a limited liability company is just that, to limit the liability of

the members. *See* Illinois Limited Liability Company Act, 805 ILCS 180/10-10:

> [T]he debts, obligations, and liabilities of a limited liability company, whether arising
> in contract, tort, or otherwise, are solely the debts, obligations, and liabilities of the
> company. A member or manager is not personally liable for a debt, obligation, or
> liability of the company solely by reason of being or acting as a member or
> manager.[23]

DD argues that the County has "discretion" to view the bid by DD, a limited liability

company, as a bid by a joint venture. (DD's Post-Trial Mem. at 71.) Ms. Melas testified that she

did not know the difference between the two forms. (R. 1927-28.) But Mr. LaMont testified that

he is aware that the members of a limited liability company have no liability for the debts of the

company. (R. 2078.) The result is that the County has awarded a $49 million contract for state-of-

the-art medical equipment to a limited liability company with $100,000 of assets. If the County did

---

[23] The Delaware Limited Liability Act under which DD was formed contains a virtually
identical provision:

> [T]he debts, obligations and liabilities of a limited liability company, whether arising
> in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of
> the limited liability company, and no member or manager of a limited liability
> company shall be obligated personally for any such debt, obligation or liability of the
> limited liability company solely by reason of being a member or acting as a manager
> of the limited liability company.

6 Del. C. §18-303. Both statutes permit a member to agree in the members' operating agreement to
be liable for the company's debts, but Siemens did not so agree.

"exercise its discretion" to ignore the legal form of the bidder to whom it awarded the Contract, the County's exercise of its discretion was arbitrary and capricious.

The defendants argue that the performance bond posted by DD in the amount of the contract sum satisfies any financial concerns of the County. However, it is well settled that the liability of the surety on a bond is limited to the amount of the bond, even if the owner's damages exceed the amount of the bond.

> Should [the owner's] damages exceed the amount of the bond, [the surety's] liability is nevertheless limited to the terms of its undertaking. . . . [I]n a suit upon a performance bond, the extent of the surety's liability was limited to the penal sum even when the principal's liability [is] greater.

*Fisher v. Fidelity and Deposit Company of Maryland*, 125 Ill. App.3d 632, 642-43, 466 N.E.2d 332, 340 (1984) (reviewing cases). The Contract anticipates the possibility that the County's damages may exceed the amount of the bond. General Condition GC-02 is a broad indemnification and hold harmless clause.[24] It specifically provides (emphasis added):

> The Contractor expressly understands and agrees that the duty to indemnify, defend and hold harmless the County of Cook, its officials, employees and agents, *shall in no way be limited by performance bonds* or other insurance required by this contract or otherwise provided by the Contractor.

---

[24] General Condition GC-02 provides, in part:

The Contractor shall assume all liability for and shall indemnify, defend and hold harmless the County of Cook, its officials, employees, Architect, Program Manager and agents against any and all loss, liability, damages, claims, demands, costs and expenses of whatsoever nature that may be suffered by the County of Cook or any other person or persons [,] firm, corporation or association making claims against the County of Cook, its officials, employees or agents, arising out of or resulting from performance of the Work of this contract, whether or not the negligence or omissions of the Contractor, its Owners, employees, agents, or Subcontractors shall be alleged or determined.

If a performance bond were sufficient, there would have been no need for the specification of Special Condition 21 requiring the Contractor to have "similar size installations of PACs systems," "extensive project planning and installation services expertise," " local and factory based service capability" and ten years or more in business. Although Mr. LaMont testified that DD's submission of a bond satisfied his concerns about DD's bid as a limited liability company (R. 2078), he did not explain how a bond could substitute for the requirements of Special Condition 21. For the County to waive the requirements of Special Condition 21 for DD on the basis of DD's providing a bond was arbitrary and capricious.

     e.    <u>The County's equitable defenses</u>.

The County argues that equitable relief should not be awarded to GEMS because GEMS is guilty of unclean hands, fraud and laches. This Court does not find the County's equitable defenses supported by the evidence at the hearing. The evidence does not support the County's claims that GEMS submitted "bogus, altered and false information" to the County. (Deft. County of Cook's Proposed Findings of Fact at 64.) The County's assertion of laches is likewise unfounded. The County did not detrimentally rely on GEMS' not filing suit in the three months between the award of the Contract and the filing of the lawsuit. Indeed, the evidence showed that as of the date of the filing of the lawsuit, the County had not begun any work on the radiology build-out because the necessary drawings had not been completed, and the first of the drawings were not issued until Thanksgiving (R. 2107-08.) Actual construction did not begin until January, 2001. (R. 2173.)

II. GEMS has no adequate remedy at law.

Illinois law does not provide damages in the form of lost profits to the unsuccessful bidder on a public contract. *Court Street Steak House,* 163 Ill.2d at 169-70, 643 N.E.2d at 786. The defendants do not contest GEMS' claim that it has no adequate remedy at law.

III. GEMS will suffer irreparable injury.

Although the County's evidence about the ultimate schedule for the opening of the new hospital was deficient, it is undeniable that the build-out of the radiology unit is underway. GEMS argued to the District Judge at the TRO hearing in October, 2000 that unless a TRO was entered, the radiology build-out would be designed and built out around Siemens' equipment making it more difficult to make a change if GEMS proves its allegations. The County persuaded the District Judge not to enter the TRO, based on representations and testimony: (a) that construction on the radiology unit was "supposed to begin" in five days, a representation that Mr. LaMont admitted was without any basis in fact; (b) that to enter a TRO would "stop construction on a 70,000 square foot area;" (c) that Siemens was mounting an international effort to finalize the design plans, and that final design plans for one section were expected the following Monday with the remaining plans coming "in short order;" and (d) the County's somewhat inconsistent statement that "there is no emergency. This hospital is a long way from completion." *See* Tr. of Oct. 26, 2000 at 3, 15; Tr. of Oct. 27, 2000 at 63-68. The representations and testimony about the status of the project and Siemens' work on the design plans were not correct, as demonstrated by Mr. Duran's testimony discussed *above* and his e-mails to the non-cooperating Siemens' divisions (Pl. Ex. 258-260), although the County may not have been aware of the real situation at Siemens. In fact, by the beginning of December, 2000, a month later, the build-out of the radiology unit had not begun and only one-third of the final

81

construction drawings had been delivered to Walsh-Riteway. (R. 1702, 1706.) However, the County now stresses the testimony of its witness Mr. Wierec that every day that goes by makes it more difficult to change equipment vendors because the radiology build-out is being designed and built around the Siemens equipment, which is just what GEMS argued at the TRO hearing. (R. 1726.)

Mr. Wierec testified that it is easier to implement a mitigation plan earlier in a construction project than later. (R. 1698-99.) If GEMS is required to wait until a trial on the merits in order to obtain relief, the work may have progressed to the point where, as a practical matter, no relief is available. This Court concludes that GEMS has shown that it will suffer irreparable harm if a preliminary injunction is not entered.

IV. <u>Balancing the harms on the sliding scale.</u>

This requires another analysis of the likelihood of GEMS' success on the merits, because "the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position." *Ty, Inc.*, 237 F.3d at 895.

Based on the Findings of Fact and Conclusions of Law, this Court concludes: (a) that the likelihood of GEMS' obtaining a declaration that DD's bid was non-responsive is great; (b) that the likelihood of GEMS' obtaining an injunction prohibiting the County and DD from proceeding on the Contract because DD's bid was materially non-responsive and because the County's award of the Contract was arbitrary, contrary to the County's ordinances and the product of fraud, is likewise great. Whether GEMS will obtain a declaration that its was the lowest responsive bid is more difficult to predict but the likelihood is still substantial. As discussed above, this Court found that GEMS' bid was materially responsive to Bid Package #3, based on the evidence presented at the hearing. That finding was based in part on the fact that, for the reasons discussed above, DD and

the County were precluded from presenting any evidence that the technical portions of GEMS' bid were not responsive. Thus, it is more difficult to predict whether, after a trial on the merits, the Court would declare that GEMS' bid was the lowest responsive bid. However, the evidence presented to this Court did not demonstrate that GEMS' bid was non-responsive in any material way.

In light of this, the balance of irreparable harms need not favor GEMS heavily to justify the issuance of a preliminary injunction. DD does not suggest that it will incur any irreparable harm except increased expenses and the possible risk that it will never be paid, as to which there was no evidence. *See* DD's Post-Trial Mem. at 111. The County identifies two potential harms: increased costs to complete the construction, and delay in completion of the radiology unit and possible delay in completing the entire hospital, delaying its use by the County's indigent patients. (Def. County of Cook's Proposed Findings of Fact at 69.)

The County can be protected by a bond against any increased costs incurred if a preliminary injunction is improperly entered. The County's argument about delay fails to focus on the main issue here, the harm resulting from the issuance of preliminary relief pending a resolution on the merits. The County's estimate of "another year of overcrowding" (*Id.*) is based on testimony concerning the impact of a permanent injunction requiring rebidding or a writ of mandamus directing that the Contract be awarded to GEMS. (R. 2072-76; 1710-11.) There was no testimony regarding the impact of a preliminary injunction halting the Contract until a determination on the merits.

The laudable desire of the doctors and County officials to provide a first class hospital for indigent patients must be considered, as must be the physical deterioration of the current building and resulting limitations on patient care. However, the County's argument about balancing harms fails to admit and deal candidly with the fact that the hospital's opening on time is highly questionable at best, even without an injunction entered in this case. The opening of the hospital will

83

likely be delayed for reasons unrelated to this lawsuit. The *additional* delay resulting from an injunction, whether preliminary or permanent, cannot be estimated based on the evidence presented. If a preliminary injunction is entered that is subsequently dissolved, a mitigation plan might be implemented to eliminate or reduce the impact of any delay. As Mr. Wierec testified, a mitigation plan may require overtime work and scheduling of critical path subcontractors to accelerate the work. (R. 2192.) Thus, it might result in additional costs, but such costs could be covered by a bond to be posted by GEMS.

The balance of harms favors the entry of a preliminary injunction.

V. Harm to the public.

The public has a number of important interests in this lawsuit. As the County stresses, there is the interest of the public, especially the indigent for whom the hospital is a critical supplier of medical services, in having the new hospital completed as soon as possible. But there is also the recognized public interest in maintaining the integrity of the competitive bidding system.

> Competitive bidding statutes are enacted "for the purpose of inviting competition, to guard against favoritism, improvidence, extravagance, fraud and corruption and to secure the best work or supplies at the lowest price practicable."

*Court Street Steak House*, 163 Ill. 2d at 165, 643 N.E.2d at 784, quoting other authority. As noted above, there were only three bids submitted for Bid Package #3, and one was immediately disqualified. If the County's bidding process is perceived to lack integrity, if a contract is awarded to a non-responsible bidder with a materially non-responsive bid and there is no remedy, the likely result is that qualified bidders will not go to the expense and effort to bid. Furthermore, the Contract awarded here actually put the taxpayers at risk by awarding a $49 million contract for critical pieces

of medical equipment to a limited liability company with $100,000 in assets and no binding obligation on the part of the putative supplier to supply the equipment.

The potential harm to the public from the entry of the preliminary injunction is outweighed by the interest of the public as well as GEMS in a contract that materially complies with the requirements of Bid Package #3.

## CONCLUSION

For the foregoing reasons,

1.     This Court respectfully recommends that plaintiff's motion for a preliminary injunction [Dkt #4] be GRANTED, and that the County and DD be enjoined from proceeding with Contract No. 00-53-844 for Medical Equipment, Bid Package #3 pending resolution of this case on the merits.

2.     Additionally, this Court respectfully recommends that DD's Motion for Disposition on Partial Findings be DENIED. [Dkt #62.]

3.     Plaintiff's Motion to Amend Its Verified Complaint [Dkt #83] is GRANTED, and Plaintiff is granted leave to file its Amended Complaint.

4.     DD's Motion to Strike Testimony and Exhibits [Dkt #76] is DENIED.

5.     DD's Objections to the Admission of Plaintiff's Exhibits 263 and 305 (sic) [Dkt #78] are SUSTAINED IN PART and DENIED IN PART.

6.     Plaintiff's Objection to Admission of DD's Exhibit 253 [Dkt #80] is DENIED.

Specific written objections to this report and recommendation may be served and filed within 10 business days from the date that this order is served. Fed. R. Civ. P. 72(a). Failure to file objections with the District Court within the specified time will result in a waiver of the right to

appeal all findings, factual and legal, made by this Court in the report and recommendation.

*Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

ENTER:

Geraldine Soat Brown
United States Magistrate Judge

Dated: April 4, 2001